[L.A. No. 29917. In Bank. May 1, 1973.]

JUNE CROWNOVER et al., Plaintiffs and Respondents, v.
JAMES A. MUSICK, as Sheriff, etc., Defendant and Appellant.

[Sac. No. 7904. In Bank. May 1, 1973.]

CLARENCE REYNOLDS et al., Plaintiffs and Appellants, v.
CITY OF SACRAMENTO, Defendant and Respondent.

[Sac. No. 7905. In Bank. May 1, 1973.]

LEONARD F. GLANCY et al., Plaintiffs and Appellants, v.
COUNTY OF SACRAMENTO, Defendant and Respondent.

[Sac. No. 7906. In Bank. May 1, 1973.]

LEONARD L. GLANCY et al., Plaintiffs and Appellants, v.
THE MUNICIPAL COURT FOR THE SACRAMENTO JUDICIAL
DISTRICT OF SACRAMENTO COUNTY, Defendant and Respondent;
THE PEOPLE, Real Party in Interest and Respondent.

(Consolidated Appeals.)

**COUNSEL**

Cecil Hicks, District Attorney, Michael R. Capizzi, Assistant District Attorney and Oretta D. Sears, Deputy District Attorney, for Defendant and Appellant.

Peter B. Van Gelder and Ronald F. Sypnicki for Plaintiffs and Appellants.

Roger A. Newlander as Amicus Curiae on behalf of Plaintiffs and Appellants and Plaintiffs and Respondents.

Evelle J. Younger and Thomas C. Lynch, Attorneys General, Doris H. Maier, Assistant Attorney General, Daniel J. Kremer, Deputy Attorney General, James P. Jackson, City Attorney, John Liebert, Deputy City Attorney, John B. Heinrich, County Counsel, Robert L. Pleines, Deputy County Counsel, Berrien E. Moore and Kenneth P. Scholtz for Plaintiffs and Respondents, for Defendants and Respondents and for Real Party in Interest and Respondent.

Robert Flandrick, City Attorney (Bell), Martin & Flandrick and Jack L. White as Amici Curiae on behalf of Defendant and Appellant, Defendants and Respondents and Real Party in Interest and Respondent.

**OPINION**

**SULLIVAN, J.**—In these four cases, consolidated on appeal, we must determine the constitutionality of ordinances of the Counties of Orange and Sacramento and of the City of Sacramento which prohibit the service of food or drink and the providing of entertainment by so-called "topless" women and "bottomless" persons of either sex in any establishment, and also prohibit live acts and exhibitions by such persons in any public place or place open to the public or to public view, excepting in all instances theaters or similar establishments primarily devoted to theatrical perform-

ances. All of the ordinances in question were adopted pursuant to Penal Code sections 318.5[1] and 318.6,[2] which were added to the Penal Code in 1969.

In *Crownover* v. *Musick* (hereafter L.A. 29917) plaintiffs are owners and employees of Orange County establishments which serve food and alcoholic beverages and feature "topless" waitresses and "topless" and nude entertainers. Plaintiffs brought an action in the Orange County Superior Court for declaratory and injunctive relief attacking the constitutionality of Orange County Ordinance No. 2356 and asking that its enforcement be prohibited.[3] Ordinance No. 2356 declares it to be a misdemeanor for a female to appear "topless" or for a person of either sex to appear "bottomless" (to use the common parlance) while serving food or beverages or while "participating in any live act, demonstration, or exhibition in any public place, place open to the public, or place open to public view." In addition, anyone who "permits, procures, counsels or assists" in such exposure is also guilty of a misdemeanor. However, the provisions of ordinance No. 2356 do not apply to a "theater, concert hall, or similar establishment which is primarily devoted to theatrical performances." The Orange County Board of Supervisors declared the ordinance "to be an urgency measure necessary for the immediate preservation of the public peace, health and safety," finding that the conduct prohibited

[1]Section 318.5, which concerns the service of food and beverages, provides as follows: "Nothing in this code shall invalidate an ordinance of, or be construed to prohibit the adoption of an ordinance by, a county or city, if such ordinance directly regulates the exposure of the genitals or buttocks of or the breasts of any person who acts as a waiter, waitress, or entertainer, whether or not the owner of the establishment in which the activity is performed employs or pays any compensation to such person to perform such activity, in an establishment which serves food, beverages, or food and beverages, including, but not limited to, alcoholic beverages, for consumption on the premises of such establishment.

"The provisions of this section shall not apply to a theater, concert hall, or similar establishment which is primarily devoted to theatrical performances.

"This section shall be known and may be cited as the 'Quimby-Walsh Act.' "

[2]Section 318.6, which concerns exposure in the course of "live acts" and exhibitions in public places, provides as follows: "Nothing in this code shall invalidate an ordinance of, or be construed to prohibit the adoption of an ordinance by, a city or county, if such ordinance relates to any live acts, demonstrations, or exhibitions which occur in public places, places open to the public, or places open to public view and involve the exposure of the private parts or buttocks of any participant or the breasts of any female participant, and if such ordinance prohibits an act or acts which are not expressly authorized or prohibited by this code.

"The provisions of this section shall not apply to a theater, concert hall, or similar establishment which is primarily devoted to theatrical performances."

[3]Defendants were James A. Musick, Sheriff of Orange County, the State of California, and other persons identified by fictitious names. Defendant sheriff was the sole party appearing below and is the sole appellant before us.

therein was "so detrimental to the mental and moral state of the people of this County as to justify its immediate prohibition."[4]

---

[4]Ordinance No. 2356 provides in pertinent part:

"SECTION 1. Division 11 is hereby added to Title 3 of the Codified Ordinances of the County of Orange· to read as follows:

DIVISION 11

UNLAWFUL EXPOSURE OF PRIVATE PARTS AND FEMALE BREASTS

Article 1

Exposure by Waiters, Waitresses and Entertainers

"Sec. 311.011. Prohibitions: Definitions: Waiters, Waitresses, Entertainers.

"Every person is guilty of a misdemeanor who, while acting as a waiter, waitress or entertainer in an establishment which serves food, beverages, or food and beverages, including, but not limited to, alcoholic beverages, for consumption on the premises of such establishment:

"(a) Exposes his or her genitals, pubic hair, buttocks, natal cleft, perineum, anal region or pubic hair region; or

"(b) Exposes any device, costume or covering which gives the appearance of or simulates the genitals, pubic hair, buttocks, natal cleft, perineum, anal region or pubic hair region; or

"(c) Exposes any portion of the female breast at or below the areola thereof.

"Sec. 311.012. Counseling or Assisting.

"Every person is guilty of a misdemeanor who causes, permits, procures, counsels or assists any person to expose or simulate exposure as prohibited in Section 311.011.

"Sec. 311.013. Employment or Payment Not Necessary for Offense.

"A person shall be deemed to be a waiter, waitress, or entertainer if such person acts in that capacity without regard to whether or not such person is paid any compensation by the management of the establishment in which the activity is performed.

Article 2

Exposure by Performers in Public

"Sec. 311.021. Prohibitions: Definitions: Public Performance.

"Every person is guilty of a misdemeanor who, while participating in any live act, demonstration, or exhibition in any public place, place open to the public, or place open to public view:

"(a) Exposes his or her genitals, pubic hair, buttocks, natal cleft, perineum, anal region, or pubic hair region; or

"(b) Exposes any device, costume or covering which gives the appearance of or simulates the genitals, pubic hair, buttocks, natal cleft, perineum, anal region or pubic hair region; or

"(c) Exposes any portion of the female breast at or below the areola thereof.

"Sec. 311.022. Counseling or Assisting.

"Every person is guilty of a misdemeanor who causes, permits, procures, counsels or assists any person to expose or simulate exposure as prohibited in Section 311.021.

Article 3

Exemption of Theatrical Establishments

"Sec. 311.031. Exemption of Theatrical Establishments.

"The provisions of Article 1 and Article 2 of this Division shall not apply to a theater, concert hall, or similar establishment which is primarily devoted to theatrical performances.

"SECTION 2. This Ordinance is declared to be an urgency measure necessary for the

Plaintiffs alleged in substance that both the enabling statutes and the ordinances were unconstitutional on their face and as applied in that they constituted respectively an unlawful delegation and exercise of power; a prior restraint against activity protected by the First and Fourteenth Amendments to the United States Constitution and by article I, section 9, of the California Constitution; an unlawful discrimination between establishments like those of plaintiffs and theaters in violation of the equal protection clause of the Fourteenth Amendment; and a deprivation of property without due process of law.

After a hearing, the trial court granted a preliminary injunction prohibiting defendants from enforcing, or attempting to enforce, the ordinance and Penal Code sections 318.5 and 318.6, on the ground that they violated the equal protection clause of the United States Constitution and substantially equivalent provisions of the California Constitution (Cal. Const., art. I, § § 11, 21; art. XX, § 18) and the due process clause of the Fifth and Fourteenth Amendments to the United States Constitution. The county and the sheriff appeal.

In *Glancy* v. *County of Sacramento* (hereafter Sac. 7905), plaintiff Leonard Glancy owns a Sacramento County Tavern where plaintiff Susanne Haines dances "topless" and "bottomless" and serves food and beverages "topless." Plaintiffs brought an action in the Sacramento County Superior Court for injunction and declaratory judgment against the threatened enforcement of two ordinances enacted by the County of Sacramento.[5] Ordinance No. 1054 (which bans "bottomless" activity)[6] and Ordinance

---

immediate preservation of the public peace, health and safety, and shall become effective on this date. The facts constituting the emergency are as follows:

"The California State Legislature has adopted Chapters 1534 and 1535, Statutes of 1969, authorizing counties to adopt legislation of the sort contained herein. Said legislation became effective November 10, 1969. This Board finds that the conduct prohibited herein is presently taking place within the unincorporated areas of this County and is so detrimental to the mental and moral state of the people of this County as to justify its immediate prohibition."

[5]The County of Sacramento is the sole defendant.

[6]Ordinance No. 1054 provides in pertinent part:

"Section 1. *Legislative Authorization.* This ordinance is adopted pursuant to Sections 318.5 and 318.6 of the Penal Code. All words used in this ordinance which also are used in the said Sections 318.5 and 318.6, are used in the same sense and mean the same as the same respective words used in the said Sections 318.5 and 318.6 of the Penal Code.

"Section 2. *Theater—Definition.* As used in this ordinance and in Sections 318.5 and 318.6, 'theater' means a building, play house, room, hall or other place having a permanent stage upon which movable scenery and theatrical or vaudeville or similar performances are given and permanently affixed seats so arranged that a body of spectators can have an unobstructed view of the stage, and for which a county license

No. 1055 (which bans "topless" activity)[7] taken together, are essentially the same as in the Orange County ordinance. (See fn. 4, *ante.*) The differences in wording concern only immaterial variances in anatomical description. The complaint challenged the constitutionality of the Sacramento County ordinances on substantially the same grounds as those asserted in L.A. 29917. The trial court denied plaintiffs' request for a preliminary injunction in its entirety and dissolved a previously issued temporary restraining order. Plaintiffs appeal.

In *Glancy* v. *Municipal Court* (hereafter Sac. 7906), Glancy and Haines petitioned the Sacramento County Superior Court for a writ of prohibition to halt criminal proceedings brought against them in the Sacramento Municipal Court for alleged violation of ordinances Nos. 1054 and 1055. Petitioners had been charged with misdemeanors two days after the superior

for a theater is in full force and effect. This definition does not supersede the provisions of Section 1 of this ordinance.

"Section 3. *Prohibition.* Every person is guilty of a misdemeanor who:

"(a) Exposes his or her private parts or buttocks or employs any device or covering which is intended to simulate the private parts or pubic hair while participating in any live act, demonstration, or exhibition in any public place, place open to the public, or place open to public view, or while serving food or drink or both to any customer, or

"(b) Permits, procures or assists any person to so expose himself or herself, or to employ any such device.

"Section 4. *Accessories.* Every person is guilty of a misdemeanor who permits, counsels, or assists any person to violate any provision of this ordinance.

"Section 5. *Exceptions.* This ordinance does not apply to:

"(a) A theater, concert hall, or similar establishment which is primarily devoted to theatrical performance.

"(b) Any act authorized or prohibited by any state statute.

"Section 6. *Constitutionality.* If any provision or clause of this ordinance or application thereof to any person or circumstances is held invalid, such invalidity shall not affect other provisions or applications of this ordinance which can be given effect without the invalid provision or application, and to this end the provisions of this ordinance are declared to be severable."

[7]Ordinance No. 1055 duplicates sections 1, 2, 4, 5, and 6 of the "bottomless" ordinance, and otherwise provides in pertinent part:

"Section 3. *Prohibition.* Every female is guilty of a misdemeanor who while participating in any live act, demonstration, or exhibition in any public place, place open to the public, or place open to public view, or while serving food or drink or both to any customer:

"(a) Exposes any portion of either breast below a straight line so drawn that both nipples and all portions of both breasts which have a different pigmentation than that of the main portion of the breasts are below such straight line, or

"(b) Employs any device or covering, which is intended to simulate such portions of the breast, or

"(c) Wears any type of clothing so that any portion of such part of the breast may be observed."

Ordinances Nos. 1054 and 1055 appear as chapters 9.44 and 9.48, respectively, of the Sacramento County Code (with insignificant variations in form).

court had denied an injunction in Sac. 7905. Their petition, which asserted the same grounds for relief as the civil complaint in Sac. 7905, was denied. Glancy and Haines appeal from that denial. We have decided that their appeal in Sac. 7906 must be dismissed as moot, since we have been advised that on June 1, 1971, all underlying criminal charges which remained against them were dismissed on motion of the district attorney. In view of the dismissal of the charges it is evident that there is no " 'actual controversy' upon which a judgment [of prohibition] could operate," nor is there any " 'effectual relief' " to be granted to petitioners. (*Paul* v. *Milk Depots, Inc.* (1964) 62 Cal.2d 129, 132 [41 Cal.Rptr. 468, 396 P.2d 924]; *Consol. etc. Corp.* v. *United A. etc. Workers* (1946) 27 Cal.2d 859, 863 [167 P.2d 725].)

Nevertheless, the constitutionality of ordinances Nos. 1054 and 1055 is still before us, as a result of the appeal in Sac. 7905 from the order denying declaratory and injunctive relief. Otherwise plaintiffs could not obtain a final judicial determination of the issues they have raised without defending against another criminal prosecution which clearly might be brought as a result of another evening's performance. (See *Zeitlin* v. *Arnebergh* (1963) 59 Cal.2d 901, 905-906 [31 Cal.Rptr. 800, 383 P.2d 152, 10 A.L.R.3d 707].) Our dismissal for mootness of the appeal in Sac. 7906 of course does not preclude our consideration of these issues as they are raised in Sac. 7905.

In *Reynolds* v. *City of Sacramento* (hereafter Sac. 7904), plaintiff Clarence Reynolds owns and operates a tavern in the City of Sacramento at which plaintiffs Kathleen Rose Gaines and Marsha Gean McNabb, his employees, serve food and beverages "topless" and dance "topless" and "bottomless." Plaintiffs brought an action in the Sacramento County Superior Court for injunction and declaratory judgment against alleged threatened enforcement of an ordinance enacted by the City of Sacramento.[8] This ordinance (No. 2856, fourth series) became effective concurrently with county ordinances Nos. 1054 and 1055; it combines into one enactment the equivalent of the county's "topless" and "bottomless" provisions. Its operative portions are substantially identical to the provisions of the two county ordinances taken together, except that "Legislative Findings" of the city council are added which declare essentially that an "increasing trend" toward the proscribed acts in Sacramento is "adverse to the public peace, morals and good order" and, therefore, justifies the city's restrictions.[9] Plaintiffs' complaint challenged the city ordinance on

[8] The sole defendant is the City of Sacramento.

[9] The city ordinance which added sections 26.59 through 26.64 to the city code provides in relevant part (with immaterial variation in codified form):

constitutional grounds identical to those alleged by Glancy and Haines in

"SECTION 1. Sections 26.59 through 26.64 inclusive are added to the Sacramento City Code to read as follows:

"Sec. 26.59. *Legislative Findings and Authorization.*

"The City Council does hereby find that there exists in this city an increasing trend toward nude and semi-nude acts, exhibitions and entertainment, and of undress by female employees of food, drink and like establishments serving the public, and that such acts and such competitive commercial exploitation of nudity is adverse to the public peace, morals and good order; and that it is in the best interest of the public safety and convenience of this city to restrict such nudity, and the commercial promotion and exploitation thereof, as hereinafter set forth.

"All words used in these City Code Sections which are also used in Sections 318.5 and 318.6 of the Penal Code are used in the same sense and mean the same as the same respective words used in Sections 318.5 and 318.6 of the Penal Code.

"Sec. 26.60. *Same—Theater—Definitions.*

"As used in Sections 26.61 through 26.64 inclusive and in Sections 318.5 and 318.6 of the Penal Code the phrase 'theater, concert hall, or other similar establishment which is primarily devoted to theatrical performances' shall mean a building, playhouse, room, hall or other place having permanently affixed seats so arranged that a body of spectators can have an unobstructed view of the stage, upon which theatrical or vaudeville performances or similar forms of artistic expression are presented, and where such performances are not incidental to the promoting of the sale of food, drink or other merchandise, and for which a city license for a theater is in full force and effect. This definition does not supersede the provisions of Section 26.59 of this code.

"Sec. 26.61. *Prohibition Against the Display of Female Breasts.*

"Every female is guilty of a misdemeanor who, while participating in any live act, demonstration, or exhibition in any public place, place open to the public, or place open to public view, or while serving food or drink or both to any customer;

"a. exposes any portion of either breast below a straight line so drawn that both nipples and all portions of both breasts which have a different pigmentation than that of the main portion of the breasts are below such straight line, or

"b. employs any device or covering, which is intended to simulate such portions of the breast, or

"c. wears any type of clothing so that any portion of such part of the breast may be observed.

"Sec. 26.62. *Prohibition Against Display of Private Parts.*

"Every person is guilty of a misdemeanor who exposes his or her private parts or buttocks, or employs any device or covering which is intended to simulate the private parts or pubic hair of such person, while participating in any live act, demonstration, or exhibition in any public place, place open to the public, or place open to public view, or while serving food or drink or both to any customer.

"Sec. 26.63. *Same—Accessories.*

"Every person is guilty of a misdemeanor who permits, procures, counsels, or assists any person to violate any provision of Sections 26.61 or 26.62 of this Code.

"Sec. 26.64. *Same—Exceptions.*

"Sections 26.61 through 26.63 inclusive of this Code do no apply to:

"a. A theater, concert hall, or similar establishment which is primarily devoted to theatrical performances.

"b. Any act authorized or prohibited by any state statute.

"SECTION 2. This ordinance is hereby declared to be an emergency measure to take effect on November 20, 1969, the reason for said emergency being that the County

their attack on the county ordinances in Sac. 7905. After a hearing,[10] the trial court denied a preliminary injunction and dissolved a previously issued temporary restraining order. Plaintiffs appeal.

Having concluded that the appeal in Sac. 7906 should be dismissed as moot, we will confine ourselves to the issues raised in the remaining three cases. Since the issues are essentially the same in all three, we shall refer to all plaintiffs and all defendants of the three cases as a group.

I

So that we may focus on the precise issues confronting us, we make some preliminary observations.

■ First, although all plaintiffs have launched constitutional attacks on the local ordinances, plaintiffs in L.A. 29917 have in addition extended these attacks to Penal Code sections 318.5 and 318.6. The thrust of the attacks seems to be that these statutes in some way effectuated the adoption of the local ordinances. Such is obviously not the case. Section 318.5 (see fn. 1, *ante*) merely permits cities and counties to regulate the "topless" or "bottomless" exposure of waiters, waitresses and entertainers in establishments serving food and drink except theaters and similar establishments. Section 318.6 (see fn. 2, *ante*) similarly permits the regulation of "topless" or "bottomless" exposure in relation to "live acts, demonstrations or exhibitions" in public places or places open to the public, except theaters and similar establishments. These statutes perform no active role in the adoption of the designated kind of ordinance; they merely permit cities and counties to adopt such an ordinance if they so desire. The Legislature has expressly evidenced in each statute its intent to permit local regulation of the conduct therein described (see *In re Cox* (1970) 3 Cal.3d 205, 220 [90 Cal.Rptr. 24, 474 P.2d 992]; *Pipoly* v. *Benson* (1942) 20 Cal.2d 366, 371-372 [125 P.2d 482, 147 A.L.R. 515]) insofar as any such regulation might have otherwise invaded a field previously held to have been preempted by the state. (See *In re Lane* (1962) 58 Cal.2d 99, 102-105 [22 Cal.Rptr. 857, 372 P.2d 897]; *In re Moss* (1962) 58 Cal.2d 117, 119 [23 Cal.Rptr. 361, 373 P.2d 425].)

■ Neither do Penal Code sections 318.5 and 318.6 nor the instant

of Sacramento has adopted a similar ordinance which shall become effective on November 20, 1969, and it is desireable [*sic*] that the City and County ordinances on this subject become effective on the same date.

[10] The Sacramento Superior Court consolidated the Reynolds and Glancy actions for hearing.

ordinances authorized by such sections conflict with article XX, section 22 of the California Constitution which vests in the Department of Alcoholic Beverage Control "the exclusive power, except as herein provided and in accordance with laws enacted by the Legislature, to license the manufacture, importation and sale of alcoholic beverages in this State . . . ."

Several Courts of Appeal have reasoned that similar local ordinances may properly regulate live entertainment in taverns, while the department's jurisdiction remained intact to license the sale of alcoholic beverages. These courts decided that the two types of regulation were independent and distinct, and therefore ordinances relating to the subject of live entertainment did not conflict with the department's powers over the sale of alcohol. (*Cristmat, Inc.* v. *County of Los Angeles* (1971) 15 Cal.App.3d 590 [93 Cal.Rptr. 325]; *Carolina Lanes, Inc.* v. *City of Los Angeles* (1967) 253 Cal.App.2d 831 [61 Cal.Rptr. 630]; *Robins* v. *County of Los Angeles* (1966) 248 Cal.App.2d 1 [56 Cal.Rptr. 853]; *Daniel* v. *Board of Police Commissioners* (1961) 190 Cal.App.2d 566 [12 Cal.Rptr. 226], disapproved on other grounds in *Burton* v. *Municipal Court* (1968) 68 Cal.2d 684, 693 [68 Cal.Rptr. 721, 441 P.2d 281].) As the *Daniel* court noted, "[The ordinance] applies to any such establishment regardless of whether it is in the liquor business. A denial of a liquor licensee's application for a permit to have 'live' entertainment in his liquor establishment would not affect his right under his liquor license to sell liquor." (*Daniel* v. *Board of Police Commissioners, supra,* 190 Cal.App.2d at p. 571.)

All the above cases, except *Cristmat,* dealt with licensing ordinances, rather than provisions which, like those in the cases at bench, are penal in nature. We think that the reasoning of *Daniel* and its successors applies with even stronger force to exclusively penal local ordinances, since article XX, section 22, does not reserve to the department, nor to the State of California, exclusive power with respect to criminal acts occurring on licensed premises. Although the state has preempted the field of criminal aspects of intoxication (Pen. Code, § 647, subd. (f); *People* v. *Lopez* (1963) 59 Cal.2d 653 [30 Cal.Rptr. 813, 381 P.2d 637]; *In re Zorn* (1963) 59 Cal.2d 650 [30 Cal.Rptr. 811, 381 P.2d 635]), localities may still regulate, within constitutional limits, other nonpreempted acts on licensed and nonlicensed premises. While all the above cases, except *Robins,* dealt with entertainment or activities other than waiting on table, we find that ordinances regulating the service of food or beverages likewise do not conflict with the department's jurisdiction. Regulation by the state of the nudity of those serving food or drinks is a subject distinct from the regulation of the sale of those drinks. Local regulation pursuant to the authoriza-

tion of state statutes of the state of dress of waiters, waitresses or entertainers in establishments serving food or beverages does not per se conflict with the power of the department to license and regulate the manufacture, sale, purchase, possession or transportation of alcoholic beverages.

Second, the various ordinances involved in the cases at bench (see fns. 4, 6, 7 and 9, *ante*) follow closely the essential wording of the statutes and by their language conform in scope to the designated regulatory area over which the state has yielded its preemptive claims. Thus the ordinances directly regulate conduct within the delineated statutory limits. They proscribe specific behavior (i.e., "topless" or "bottomless" exposure) by particular persons in designated establishments other than theaters. They do not expressly prohibit speech.

Third, the ordinances are directed at conduct, not words or speech. The ordinances do not involve a prohibition resting "squarely upon [the] exercise of the 'freedom of speech' " (*Cohen* v. *California* (1971) 403 U.S. 15, 19 [29 L.Ed.2d 284, 290, 91 S.Ct. 1780]); nor do they restrict a particular form of speech considered outside the scope of constitutional protection. (See *Roth* v. *United States* (1957) 354 U.S. 476, 481, 483-485 [1 L.Ed.2d 1498, 1504-1505, 1506-1507, 77 S.Ct. 1304]; *Chaplinsky* v. *New Hampshire* (1942) 315 U.S. 568, 571-572 [86 L.Ed. 1031, 1034-1035, 62 S.Ct. 766].) We are not presented with the problems raised in obscenity cases.

## II

As previously indicated, plaintiffs contend that the respective ordinances are unconstitutional on their face and as applied, in that they infringe upon the rights of freedom of speech and expression guaranteed by the First and Fourteenth Amendments to the United States Constitution and by article I, section 9 of the California Constitution.

In essence, plaintiffs' argument runs as follows: that the ordinances are directed to the prohibition of public nude entertainment; that since entertainment is communicative, it is a form of speech so that the ordinances prohibit speech; that "topless" waitresses, as well as "topless" or "bottomless" dancers are entertainment; that since nude entertainment cannot be prohibited unless it is obscene, the ordinances are unconstitutionally overbroad because they prohibit non-obscene speech; and that, even assuming the prohibition of non-obscene nude entertainment is merely incidental to the purposes of the ordinances, they are nevertheless unconstitutional because they fail to fulfill a compelling public purpose. The position of

defendants, on the other hand, is that the ordinances are directed toward the legitimate regulation of conduct rather than the prohibition of speech and therefore constitute a valid exercise of the police power.

Our resolution of this dispute requires us to examine the relationship between speech and conduct and to consider the principles which have been developed, particularly by the United States Supreme Court, in regard to symbolic conduct. Although it has been said that there is no constitutional distinction between speech and conduct[11] the high court has refused to accept the view that all conduct is to be deemed speech merely because it was intended to be communicative in some way. (See *United States* v. *O'Brien* (1968) 391 U.S. 367, 376 [20 L.Ed.2d 672, 679, 88 S.Ct. 1673].) As will appear the court has separately conceptualized "speech" and conduct and in a variety of contexts has made an accommodation between them.

Freedom of speech is not an absolute. *(Konigsberg* v. *State Bar* (1961) 366 U.S. 36, 49 [6 L.Ed.2d 105, 115-116, 81 S.Ct. 997]; *Roth* v. *United States, supra,* 354 U.S. 476, 483 [1 L.Ed.2d 1498, 1506]; *Schenck* v. *United States* (1919) 249 U.S. 47, 52 [63 L.Ed. 470, 473, 39 S.Ct. 247].)[12] In *Konigsberg,* the court explained this principle: "Throughout its history this Court has consistently recognized at least two ways in which constitutionally protected freedom of speech is narrower than an unlimited license to talk. On the one hand, certain forms of speech, or speech in certain contexts, has been considered outside the scope of constitutional protection. [Fn. omitted.] [Citations.] On the other hand, general regulatory statutes, *not intended to control the content of speech* but incidentally limiting its unfettered exercise, have not been regarded as the type of law the First or Fourteenth Amendment[s] forbade Congress or the States to pass, when they have been found justified by subordinating valid governmental interests, a prerequisite to constitutionality which has necessarily involved *a weighing of the governmental interest involved.* [Citations.]" *(Konigsberg* v. *State Bar, supra,* pp. 36, 49-51 [6 L.Ed.2d 105, 115-117], italics added.) More recently in *Cohen* v. *California,* the court reiterated that "the First and Fourteenth Amendments have never been thought to give absolute protection to every individual to speak whenever or wherever he pleases, or to use any form of address in any circumstances that he

[11]"A constitutional distinction between speech and conduct is specious. Speech *is* conduct, and actions speak." (Henkin, *The Supreme Court, 1967 Term—Foreword: on Drawing Lines* (1968) 82 Harv.L.Rev. 63, 79, original italics.)

[12]Immortally illustrated by Mr. Justice Holmes in *Schenck:* "The most stringent protection of free speech would not protect a man in falsely shouting fire in a theater and causing a panic." (249 U.S. at p. 52 [63 L.Ed. at p. 473].)

chooses." (*Cohen* v. *California* (1971) 403 U.S. 15, 19 [29 L.Ed.2d 284, 290, 91 S.Ct. 1780].)

These general principles governing "pure" speech are a fortiori applicable to conduct mixed with speech—symbolic conduct or nonverbal expression as some writers have designated it. (See generally Note, *Symbolic Conduct* (1968) 68 Colum.L.Rev. 1091.) Two additional competing principles emerge: First, some conduct which is expressive or communicative may be entitled to First Amendment protection (*Tinker* v. *Des Moines School Dist.* (1969) 393 U.S. 503, 505-506 [21 L.Ed.2d 731, 736-737, 89 S.Ct. 733]); second, "certain forms of conduct mixed with speech may be regulated or prohibited." (*Cox* v. *Louisiana* (II) (1965) 379 U.S. 559, 563 [13 L.Ed.2d 487, 491, 85 S.Ct. 476]; see also *United States* v. *O'Brien* (1968) 391 U.S. 367, 376-377 [20 L.Ed.2d 672, 679-680, 88 S.Ct. 1673].) But although the principles compete, they have neither equal standing nor equal value. Reluctant to give symbolic conduct the same degree of First Amendment protection as pure speech, the Supreme Court declared in *Cox* v. *Louisiana* (I) (1965) 379 U.S. 536, 555 [13 L.Ed.2d 471, 484, 85 S.Ct. 453]: "We emphatically reject the notion . . . that the First and Fourteenth Amendments afford the same kind of freedom to those who would communicate ideas by conduct such as patrolling, marching, and picketing on streets and highways, as these amendments afford to those who communicate ideas by pure speech."

Thus the court has used a balancing test with different weights thrown into the scales. As one writer has expressed it: "One would expect, then, that in discussing symbolic speech the courts would be careful to establish criteria for identifying conduct which has communicative value and for which first amendment protection is required. [Fn. omitted.] Such, however, has not been the case. The courts have instead substituted for a refined definition of symbolic speech a balancing process weighted in favor of state interest and applied indiscriminately to all conduct arguably related to speech. [Fn. omitted.]" (Note, *Symbolic Conduct, supra,* 68 Colum.L.Rev. 1091, 1092.)

Applying this balancing test, the high court has afforded First Amendment protection to conduct which was in essence "speech" or "words" or "public utterance," albeit scurrilous and offensive (*Cohen* v. *California, supra,* 403 U.S. 15, 22-25 [29 L.Ed.2d 284, 292-294]) or which was "closely akin to 'pure speech'" while being neither actually nor potentially disruptive. (*Tinker* v. *Des Moines School Dist., supra,* 393 U.S. 503, 505-506.) In *Cohen,* the court reversed the conviction for disturbing the peace (Pen. Code, § 415) of an anti-war protestor who in the corridor of

the Los Angeles County Courthouse wore a jacket bearing a statement against the draft using a "four-letter" word. Writing for the court, Justice Harlan observed: "The conviction quite clearly rests upon the asserted offensiveness of the *words* Cohen used to convey his message to the public. The only 'conduct' which the State sought to punish is the fact of communication. Thus, we deal here with a conviction resting solely upon 'speech,' cf. *Stromberg* v. *California*, 283 U.S. 359 (1931), not upon any separately identifiable conduct which allegedly was intended by Cohen to be perceived by others as expressive of particular views but which, on its face, does not necessarily convey any message and hence arguably could be regulated without effectively repressing Cohen's ability to express himself." (*Cohen* v. *California, supra,* 403 U.S. 15, 18 [29 L.Ed.2d 284, 289-290], original italics.) In *Tinker* the court held that the wearing of black armbands by public school pupils to protest the United States' policy in Vietnam "in the circumstances of this case was entirely divorced from actually or potentially disruptive conduct by those participating in it. It was *closely akin to 'pure speech'* which, we have repeatedly held, is entitled to comprehensive protection under the First Amendment. Cf. *Cox* v. *Louisiana,* 379 U.S. 536, 555 (1965); *Adderley* v. *Florida,* 385 U.S. 39 (1966)." (*Tinker* v. *Des Moines School Dist., supra,* 393 U.S. 503, 505-506, italics added.)

Similarly in *Brown* v. *Louisiana* (1966) 383 U.S. 131, 142 [15 L.Ed.2d 637, 645, 86 S.Ct. 719], a silent sit-in in a public library to protest its segregated facilities was deemed protected because "[First Amendment] rights are not confined to verbal expression. They embrace *appropriate types of action which certainly include* the right in a peaceable and orderly manner to protest by silent and reproachful presence, in a place where the protestant has every right to be, the unconstitutional segregation of public facilities. [Fn. omitted.]" (Italics added.) (See also *Garner* v. *Louisiana* (1961) 368 U.S. 157, 201 [7 L.Ed.2d 207, 235-236, 82 S.Ct. 248] (Harlan, J., concurring) (sit-in at segregated lunch counter was "as much a part of the *'free trade in ideas,'* [citation] as is verbal expression, more commonly thought of as 'speech' ") (italics added).)

The high court has also held the display of a red flag, as a symbol of opposition to organized government, could not be constitutionally prohibited (*Stromberg* v. *California* (1931) 283 U.S. 359, 369 [75 L.Ed. 1117, 1123, 51 S.Ct. 532, 73 A.L.R. 1484]); and that a state requirement that school children salute the flag and recite the pledge of allegiance unconstitutionally abridged First Amendment freedoms of speech and religion. (*Board of Education* v. *Barnette* (1943) 319 U.S. 624, 632-634 [87 L.Ed. 1628, 1634-1635, 63 S.Ct. 1178, 147 A.L.R. 674].) Speaking for

the court in *Barnette,* Justice Jackson remarked: "There is no doubt that, in connection with the pledges, the flag salute is a *form of utterance. Symbolism is a primitive but effective way of communicating ideas.* The use of an emblem or flag to symbolize some system, idea, institution, or personality, is a short cut from mind to mind. . . . Symbols of State often convey political ideas just as religious symbols come to convey theological ones. . . . A person gets from a symbol the meaning he puts into it, and what is one man's comfort and inspiration is another's jest and scorn." (*Id.* at pp. 632-633 [87 L.Ed. at pp. 1634-1635], italics added.)

On the other hand, as has been noted, the Supreme Court has applied the First Amendment balancing test so as to *permit* the regulation of certain conduct which was not protected merely because it expressed an idea. In *Cox* v. *Louisiana* (I), *supra,* 379 U.S. 536, 554-555 [13 L.Ed.2d 471, 483-484], although reversing on other grounds a conviction under a Louisiana statute prohibiting the obstruction of public passages, the court nevertheless rejected a contention that the statute was unconstitutional on its face: "The rights of free speech and assembly, while fundamental in our democratic society, still do not mean that everyone with opinions or beliefs to express may address a group at any public place and at any time." (*Id.* at p. 554 [13 L.Ed.2d at pp. 483-484].) Similarly, in upholding the narrowly drawn statute at issue in *Cox* v. *Louisiana* (II), *supra,* 379 U.S. 559 (picketing or parading near courthouse with specific intent to obstruct justice), the court commented: "Nor does such a statute infringe upon the constitutionally protected rights of free speech and free assembly. The conduct which is the subject of this statute—picketing and parading —is subject to regulation even though intertwined with expression and association. The examples are many of the application by this Court of the principle that certain forms of conduct mixed with speech may be regulated or prohibited." (*Id.* at p. 563 [13 L.Ed.2d at p. 491].)

The high court's balancing analysis of activity which arguably contains both "speech" and "nonspeech" elements has been most fully set forth in *United States* v. *O'Brien, supra,* 391 U.S. 367. In that case the defendant publicly burned his selective service registration certificate and was convicted under a federal statute prohibiting its knowing destruction or mutilation. The court rejected his contention that the statute was unconstitutional because his act, committed in order to protest the war in Vietnam, was protected "symbolic speech" within the First Amendment. The court said at pages 376-377 [20 L.Ed.2d at pages 679-680]: "We cannot accept the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea. However, even on the assumption that the alleged communicative

element in O'Brien's conduct is sufficient to bring into play the First Amendment, it does not necessarily follow that the destruction of a registration certificate is constitutionally protected activity. This Court has held that when 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms. To characterize the quality of the governmental interest which must appear, the Court has employed a variety of descriptive terms: compelling; substantial; subordinating; paramount; cogent; strong. [Fns. omitted.] Whatever imprecision inheres in these terms, we think it clear that a government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest."[13]

## A

*Persons serving food and beverages*

■ Mindful of the above principles, we first turn to consider those provisions of the ordinances which prohibit the serving of food and beverages by "topless" or "bottomless" waitresses or "bottomless" waiters. The issue need not detain us long since it is obvious that these parts of the ordinances regulate conduct and do not affect in any way the exercise of freedom of speech or expression.

The service of food and beverages is a commercial activity. It entails nothing of a communicative nature in the constitutional sense. Nothing about it calls for the protection given speech in order "to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." (*Roth* v. *United States, supra,* 354 U.S. 476, 484 [1 L.Ed.2d 1498, 1506].) This ordinary business activity is not transformed nor elevated into constitutionally protected speech or expression merely because the waiter or waitress is unclothed. Such business conduct does not become "symbolic" and thus "communicative" in the constitu-

---

[13]In explanation of the quality of the governmental interest, the court cited *N.A.A.C.P.* v. *Button* (1963) 371 U.S. 415, 438 [9 L.Ed.2d 405, 421, 83 S.Ct. 328]; *Sherbert* v. *Verner* (1963) 374 U.S. 398, 403 [10 L.Ed.2d 965, 969, 83 S.Ct. 1790]; *N.A.A.C.P.* v. *Alabama* (1958) 357 U.S. 449, 464 [2 L.Ed.2d 1488, 1500, 78 S.Ct. 1163]; *Bates* v. *Little Rock* (1960) 361 U.S. 516, 524 [4 L.Ed.2d 480, 486, 80 S.Ct. 412]; *Thomas* v. *Collins* (1945) 323 U.S. 516, 530 [89 L.Ed. 430, 440, 65 S.Ct. 315].)

tional sense because it occurs in "topless" or "bottomless" fashion. Such nude activity is nothing more than a commercial exhibition designed to stimulate the customer and promote sales.

On the contrary, these regulatory provisions are a proper exercise of the police power. Almost 50 years ago in *Miller* v. *Board of Public Works* (1925) 195 Cal. 477, 490 [234 P. 381, 38 A.L.R. 1479], this court noted that a "large discretion is vested in the legislative branch of the government with reference to the exercise of the police power." We also said that "as long as there are considerations of public health, safety, morals, or general welfare which the legislative body may have had in mind, which have justified the regulation, it must be assumed by the court that the legislative body had those considerations in mind and that those considerations did justify the regulation. [Citation.]"

The prohibitions on "bottomless" waiters and waitresses and on "topless" waitresses may rationally be justified by at least two of the above four legitimate state purposes. Orange County Ordinance No. 2356 essentially states all four grounds. (§ 2, see fn. 4, *ante*.) Ordinance No. 2856, fourth series of the City of Sacramento, refers to all but public health. (§ 26.59; see fn. 9, *ante*.) Only Sacramento County Ordinance Nos. 1054 and 1055 (see fns. 6 and 7, *ante*) make no explicit findings, but any or all of the four above purposes may be implied. At least two of these four contentions — public morals and public welfare — may conceivably justify the prohibitions. "Topless" waitresses, who mingle with customers, may stimulate breaches of the peace amongst a bar's largely male clientele. Tawdry establishments featuring nudity as a commercial exhibition and sales promotion may be detrimental to the general welfare of the surrounding community. Finally it is important to bear in mind that the ordinances do not proscribe the service of food and drink but only regulate the *manner* in which the service is conducted.

B

*Entertainers and performers*

■ As previously noted, the ordinances before us generally prohibit "topless" exposure by females and "bottomless" exposure by every person of either sex while participating in any "live act, demonstration or exhibition" in any public place or by entertainers in establishments serving food or beverages, excepting in all instances theaters and similar establishments. None of the ordinances prohibit "topless" exposure by *males* (see fns. 4, 6, 7, and 9, *ante*). No constitutional attack has been directed against them based on male "toplessness" since obviously it has not been forbidden. Any

attempt to fashion a constitutional argument on male "toplessness" out of the provisions of the enabling statutes (see fns. 1 and 2, *ante*) must also fail for two reasons. First, as we have explained (see Part I, *ante*) the statutes themselves prescribe no regulation but merely permit local regulation in a field which may have been preempted by the state. Even if we assume for the sake of argument that the underlying statutes permit local regulation of male "toplessness," the fact is that the ordinances here involved have not done so. Second, we note that whereas Penal Code section 318.5 (see fn. 1, *ante*) permits local regulation of "the exposure of the genitals or buttocks of or the breasts of *any person* who acts as a waiter, waitress or entertainer in establishments serving food and beverages," (italics added) section 318.6 (see fn. 2, *ante*) permits local regulation by ordinance which "relates to any live acts . . . which occur in public places . . . and involve the exposure of the private parts or buttocks of any participant or the breasts of any *female* participant." (Italics added.) We can well understand a legislative concern as to persons serving food and drink which rests on hygienic reasons. Because of the collective phrasing of the provisions in section 318.5, one can conjure up desperate and strained criticism—content to behold the mote in the eye—arguing that section 318.5 interdicts male toplessness in entertainers while section 318.6 does not similarly treat male participants. If the point ever became a live issue, we think that the two sections obviously enacted in tandem may be fairly read as permitting regulation of exposure of only the female breasts of the entertainer or participant as the case may be so as to preserve section 318.5 from even this hypertechnical claim of unconstitutionality. (See *San Francisco Unified School Dist.* v. *Johnson* (1971) 3 Cal.3d 937 [92 Cal.Rptr. 309, 479 P.2d 669]; *In re Cox, supra,* 3 Cal.3d 205, 223; *In re Kay* (1970) 1 Cal.3d 930, 942-943 [83 Cal.Rptr. 686, 464 P.2d 142].) But, of course, the point is not at issue since no male toplessness has in fact been forbidden.

It is clear that these provisions of the ordinances are directed at conduct —topless and bottomless exposure—and not at speech or at conduct which is "in essence" speech or "closely akin to speech." A common sense construction (see *People* v. *Davis* (1968) 68 Cal.2d 481, 483 [67 Cal.Rptr. 547, 439 P.2d 651]) of the pertinent provisions is that they proscribe nudity in specified public places. They do not prohibit entertainment but merely enjoin that if the entertainer or performer offers it, he or she must have some clothes on. In a word the ordinances regulate conduct.

Is such conduct symbolic in the constitutional sense? Is this nudity in bars and other specified places open to the public so inherently communicative by nature as to call for the protection given the "interchange of

ideas . . . . [¶] [a]ll ideas having even the slightest redeeming social importance" (*Roth* v. *United States, supra,* 354 U.S. 476, 484 [1 L.Ed.2d 1498, 1506-1507])? The questions seem to provide their own negative answers. Unless we wish to blind ourselves to what is happening in big cities with their "topless" and "bottomless" bars and "nude live acts" in a tawdry atmosphere that blights the neighborhood if not the entire community, it is common knowledge that such conduct is nothing more than a sales gimmick. It is delusive to speculate in the face of these realities that the entertainment in this milieu will acquire protectible communicative properties by exposure of the genitals, pubic area or female breasts of the performers. *Assuming* arguendo that there may ensue in instances an expression which is communicative in the constitutional sense, we do not think it is unreasonable to regulate the *form* or *manner* of the communication.

In *City of Portland* v. *Derrington* (1969) 253 Ore. 289 [451 P.2d 111], the Supreme Court of Oregon upheld the constitutionality of an ordinance which provided: " 'It is unlawful for any female person to appear or be in a place where food or alcoholic beverage is offered for sale for consumption on the premises, so costumed or dressed that one or both breasts are wholly or substantially exposed to public view.' " (*Id.* at p. 112.) It was there said "In cases of this kind, the court must look to the substance of the regulation and ask whether the elements of communication which may be present in the regulated conduct are significant enough to bring the entire course of conduct under the protection of the First Amendment. [Citation.]" (*Id.* at p. 113.) The court continued: "Whether or not we agree with the wisdom of the city council's attempt to legislate morals, the question is not one of legislative wisdom, but one of constitutional power. The chief aim of the ordinance is to regulate conduct deemed by the lawmakers to be injurious to health, safety, and morals. The city's legislative judgment in the matter should be upheld unless the statute unreasonably impinges upon those elements of communication which may be incidental to the regulated conduct. We do not believe the interference with communication in the case at bar has enough substance to present a First Amendment question. The error in the court below was in treating the problem as one of free speech and nothing more." (*Id.* at pp. 113-114.) (See also *Hoffman* v. *Carson* (Fla. 1971) 250 So.2d 891, 892, in which the Supreme Court of Florida upheld against claims by a cocktail bar "go-go" dancer that an ordinance prohibiting "any persons to expose or exhibit his sexual organs in any public place" was unconstitutional on its face and as applied.)

Nevertheless, following the approach of the United States Supreme Court in *United States* v. *O'Brien, supra,* 391 U.S. 367, we shall assume for the

purpose of argument that there may be in some instances a "communicative element" in conduct falling within the instant ordinances sufficient to bring into play the First Amendment. On this assumption, we shall proceed to determine according to the fourfold test announced in *O'Brien*[14] whether such conduct is constitutionally protected activity.

*First,* it cannot be doubted that the governmental entities in the instant cases have the inherent constitutional power to regulate nude conduct in bars, restaurants and other public places. It is clear that such regulations are justified by considerations of public morals and general welfare (see *Consolidated Rock Products Co.* v. *City of Los Angeles* (1962) 57 Cal.2d 515, 522 [20 Cal.Rptr. 638, 370 P.2d 342]; *Miller* v. *Board of Public Works, supra,* 195 Cal. 477, 490) to mention two, and the very elasticity of the police power gives it the capacity to meet the reasonable current requirements of a changing world. (*Consolidated Rock Products Co.* v. *City of Los Angeles, supra,* 57 Cal.2d 515, 521-522.)

*Second,* it cannot be gainsaid that the regulations further "an important or substantial governmental interest" (*United States* v. *O'Brien, supra,* 391 U.S. 367, 377 [20 L.Ed.2d 672, 680]) in promoting public morals. It is our province to take note of public morality, not to dictate it. In this pluralistic society we cannot say that a "topless" female or a "bottomless" or nude person of either sex in a public place or place open to the public is "socially commonplace" (*Robins* v. *County of Los Angeles* (1966) 248 Cal.App.2d 1, 11 [56 Cal.Rptr. 853]) or has the support of a "societal consensus" (*Boreta Enterprises, Inc.* v. *Department of Alcoholic Beverage Control* (1970) 2 Cal.3d 85, 102 [84 Cal.Rptr. 113, 465 P.2d 1]). Indeed, the instant legislation conceivably gives some indication that such nude conduct is not in accord with the *mores* of the people as a whole.

*Third,* it is also clear that this governmental interest in regulating nude conduct is "unrelated to the suppression of free expression . . . ." (*United States* v. *O'Brien, supra,* 391 U.S. 367, 377.) The regulation is aimed at conduct, not speech; at "separately identifiable conduct" (*Cohen* v. *California, supra,* 403 U.S. 15, 18), not at an activity "entirely divorced from actually or potentially disruptive conduct . . . ." (*Tinker* v. *Des Moines School Dist., supra,* 393 U.S. 503, 505.)

*Fourth,* if the ordinances impose any incidental restriction on First Amendment freedom of speech and expression (and we doubt that they do) it is certainly "no greater than is essential to the furtherance of [an

[14]See text accompanying footnote 13, *ante.*

important or substantial governmental] interest." (*United States* v. *O'Brien, supra,* 391 U.S. 367, 377.) The ordinances do not *prohibit* speech or expression or entertainment; they merely direct that the entertainer cannot appear with genitals or breasts exposed. The ordinances proscribe no more than is necessary to ban the nudity which has been deemed harmful to public welfare or morals.

We are satisfied therefore that, upon the *assumption* made of some communicative element in the conduct here under discussion, the ordinances before us meet all of the four requirements set down by the Supreme Court in the *O'Brien* case.[15]

We, therefore, conclude that the ordinances on their face do not infringe upon the rights of freedom of speech or expression but are valid regulations of conduct. In light of this conclusion we reject plaintiffs' contention that the ordinances are unconstitutionally broad.[16]

---

[15]The recent Supreme Court opinion in *California* v. *LaRue* (1972) 409 U.S. 109 [34 L.Ed.2d 342, 93 S.Ct. 390] which upheld the state's broad power under the Twenty-First Amendment to regulate live "sexual" entertainment in establishments which serve liquor is not applicable to this case. The only language in the opinion potentially applicable to the instant matter involved regulation of motion pictures as well as live entertainment and thus is distinguishable, since the ordinances herein do not regulate motion pictures. "The substance of the regulations struck down prohibit licensed bars or nightclubs from displaying, *either in the form of movies or live entertainment,* 'performances' which partake more of gross sexuality than of communication. While we agree that at least some of the performances to which these regulations address themselves are within the limits of the constitutional protection of freedom of expression, the critical fact is that California has not forbidden these performances across the board. It has merely proscribed such performances in establishments which it licenses to sell liquor by the drink." (409 U.S. at p. 118 [34 L.Ed.2d at pp. 351-352].) (Italics added.)

It is true that the ordinances herein in question are not so limited. However, these ordinances do not attempt to regulate motion pictures. A close reading of the *LaRue* opinion reveals that the only area of regulation involved in that case which the Supreme Court found "within the limits of the constitutional protection of freedom of expression" was that of motion pictures and theatrical productions.

[16]Plaintiffs in L.A. 29917 allege in their complaint that Orange County Ordinance No. 2356 is not only unconstitutional on its face for the reasons previously discussed, but is a'so unconstitutional *as applied* to them. While this latter allegation asserts a distinct constitutional challenge (cf. *Cox* v. *Louisiana* (I), *supra,* 379 U.S. 536, 555-558 [13 L.Ed.2d 471, 484-486]; *Cox* v. *Louisiana* (II), *supra.* 379 U.S. 559, 564-566 [13 L.Ed.2d 487, 492-493]) plaintiffs have not pursued the point and present no argument on it. Nor does the reporter's transcript of the hearing on the preliminary injunction reveal that this claim was urged before the trial court. None of the plaintiffs in the Sacramento cases urge that the Sacramento ordinances are additionally unconstitutional *as applied* to them. Under the circumstances and in view of our foregoing conclusion as to the validity of the ordinances, we deem it unnecessary to discuss the point.

## III

■ Plaintiffs also contend that the local ordinances violate the equal protection clause of the Fourteenth Amendment to the United States Constitution in that they arbitrarily discriminate between theater-type establishments and other public places.[17] The basis of this complaint are the exemptive provisions stating that the ordinances "shall not apply to a theater, concert hall, or similar establishment which is primarily devoted to theatrical performances." (Art. 3 of Orange County Ordinance No. 2356, see fn. 4, *ante*; § 5 of Sacramento County Ordinance No. 1054, see fn. 6, *ante*; § 5 of Sacramento County Ordinance No. 1055, see fn. 7, *ante*; § 26.64 of Sacramento City Ordinance No. 2856, see fn. 9, *ante*.)[18] This statutory phrase repeats verbatim the language of the exception identically contained in Penal Code sections 318.5 and 318.6.

Recently we said in *Serrano* v. *Priest, supra,* 5 Cal.3d 584, 597: "As recent decisions of this court have pointed out, the United States Supreme Court has employed a two-level test for measuring legislative classifications against the equal protection clause. 'In the area of economic regulation, the high court has exercised restraint, investing legislation with a presumption of constitutionality and requiring merely that distinctions drawn by a challenged statute bear some rational relationship to a conceivable legitimate state purpose. [Citations.]

" 'On the other hand, in cases involving "suspect classifications" or touching on "fundamental interests," [fn. omitted] the court has adopted an attitude of active and critical analysis, subjecting the classification to strict scrutiny. [Citations.] Under the strict standard applied in such cases, the state bears the burden of establishing not only that it has a *compelling*

[17]Although plaintiffs did not expressly ground this challenge on state constitutional grounds, the trial court in No. 29917 did base its preliminary injunction on both the federal and state grounds (i.e., Cal. Const., art. I, §§ 11, 21, as well as art. XX, § 18). Since we have construed the provisions of article I, sections 11 and 21 as "substantially the equivalent" of the federal equal protection clause, our discussion of plaintiffs' federal challenge will also apply to any claim assertible under the state Constitution. (See *Serrano* v. *Priest* (1971) 5 Cal.3d 584, 596, fn. 11 [96 Cal.Rptr. 601, 487 P.2d 1241, 41 A.L.R.3d 1187].)

[18]The Orange County ordinance does not define this terminology. However, the two Sacramento County ordinances identically provide further information. (§ 2 of Ordinance No. 1054 and § 2 of Ordinance No. 1055.) (See fns. 6 and 7, *ante*.) The City of Sacramento ordinance also supplies a definition, whose wording differs in only insubstantial form from that contained in the county ordinances. (§ 26.60 of Sacramento City Ordinance No. 2856, see fn. 9, *ante*.) While we need not repeat either definition we note in passing that we do not consider either statement to be statutorily vague. Nor do we believe that the exemption is vague even as it stands by itself in the Orange County ordinance. None of the plaintiffs raises vagueness as an issue before us.

interest which justifies the law but that the distinctions drawn by the law are *necessary* to further its purpose.' (*Westbrook* v. *Mihaly* (1970) 2 Cal.3d 765, 784-785 . . . , vacated on other grounds (1971) 403 U.S. 915 . . . ; *In re Antazo* (1970) 3 Cal.3d 100, 110-111 . . . ; see *Purdy & Fitzpatrick* v. *State of California* (1969) 71 Cal.2d 566, 578-579 . . . .)" (Original italics.)

In view of our foregoing analysis we are satisfied that the cases at bench neither involve suspect classifications nor touch upon a fundamental interest so as to require our application of the "strict scrutiny" test in examining the classifications under attack. As we have explained, the ordinances do not infringe upon rights of free expression either in respect to persons serving food or beverages or in respect to entertainers and performers but are valid regulations of conduct under the police power.

Nor do we perceive how the instant cases involve a "suspect" classification. Indeed, plaintiffs make no such argument. Only the amicus appears to advance a claim which has some oblique reference to an arbitrary classification based on wealth. His point seems to be that the customer at a bar with a "cheap glass of beer" is denied enjoyment of the same type of entertainment permitted his "richer companion" in a theater. Generally speaking, a theater customer is charged more for a performance whether it is presented in the nude or not. We fail to see how this plain fact of life creates a suspect classification.

We, therefore, inquire whether the distinction inherent in the "theater exemption" bears some rational relationship to a conceivable governmental purpose. (*Serrano* v. *Priest, supra,* 5 Cal.3d at p. 597.) We are of the opinion that it does. We judicially notice (Evid. Code, § 459, subd. (a)), as a matter of generalized knowledge (Evid. Code, § 451, subd. (f)), that theater entertainers usually perform on a stage removed from the audience, while waiters and waitresses must by virtue of their calling mingle constantly with the patrons. Similarly, if entertainers perform on a stage in a bar, that stage is likely to be much smaller and closer to the patrons than is a stage located in a theater. As noted *supra* in our discussion of the police power, there are conceivable and legitimate state purposes involved in regulating the exposure of the pubic area, genitals or breasts by waiters, waitresses and entertainers. Such purposes conceivably include the furtherance of the public order, morals and welfare. But the same considerations are arguably not involved in a theater where nude persons are generally separated from the customers by a stage of large dimensions. Situations provide a rational basis to treat differently nude performers in theaters,

on the one hand, and nude performers, waiters and waitresses in establishments such as plaintiffs' on the other.

In the sum we hold that the ordinances deny neither freedom of speech and expression nor the equal protection of the laws but are in all respects valid and constitutional regulations of conduct. ■ Sections 318.5 and 318.6 of the Penal Code authorizing such ordinances were enacted after our decision in *In re Giannini* (1968) 69 Cal.2d 563 [72 Cal.Rptr. 655, 446 P.2d 535]. To the extent that it is inconsistent with the views expressed herein *Giannini* is overruled.

In Sac. 7906 the appeal is dismissed as moot. In L.A. 29917 the order granting a preliminary injunction is reversed. In Sac. 7904 and Sac. 7905 each of the orders denying a preliminary injunction is affirmed.

Wright, C. J., McComb, J., and Burke, J., concurred.

**TOBRINER, J.**—I dissent.

I sympathize with the majority in its valiant and erudite effort to uphold this legislation and these ordinances, and to fit elusive, changing, and often distasteful practices into neat categories of prohibition. Unfortunately we deal here with a subject matter that, as the courts have too often found, invites ambiguous strictures that inadvertently reach too far and wide. The legislative attempt at regulation not only fails, but extends beyond the intended purpose and catches within its fold the constitutionally protected.

At the outset, I would emphasize that I see no constitutional objection to the statute or the ordinances as to the regulations of waiters or waitresses who serve food or beverages; I see no element of communication in this activity that deserves constitutional protection.

In extending its proscriptions beyond those who serve food or drink to those who are entertainers, however, this legislation obviously reaches too far and too wide and illustrates the overbreadth that, as I have noted, often attends these prohibitory enactments. This overreaching is perhaps most obviously revealed by the state enactment which authorizes ordinances which prohibit *male* entertainers from performing when bare-breasted.

The prohibition of the male bare-breasted entertainer, in this day and age, is for all the reasons set forth in this dissent an infraction of the constitutional protection of communicative entertainment, and, in addition a somewhat ludicrous example of overbreadth. I shall point out that the ordinances violate the Constitution to the extent that they regulate the

presence or absence of costumes for male or female entertainers, but even assuming the validity of the regulation of the bare-breasted female entertainer, I submit that no case can be made to forbid the performance of the shirtless male entertainer. The custom of exposing the upper portion of the male body is universal at beaches, swimming pools, and at all manner of places; a statute that presumed to mandate the wearing of shirts, even for "the entertainer," upon the basis that it promoted or preserved "morality," must fail because it reaches far wide of its announced mark and far beyond any rational purpose. Yet "[p]recision of regulation must be the touchstone" when First Amendment rights are implicated (*N.A.A.C.P.* v. *Button* (1963) 371 U.S. 415, 438 [9 L.Ed.2d 405, 421, 83 S.Ct. 328]); overbreadth is fatal to the survival of the enactment. (See, e.g., *Coates* v. *City of Cincinnati* (1971) 402 U.S. 611, 616 [29 L.Ed.2d 214, 218, 91 S.Ct. 1686]; *N.A.A.C.P.* v. *Button, supra.*)

There can be no question but that the statute purports to undertake this grand sweep of male and female "nudity" within its scope; it sanctions the ordinance that "regulates the exposure of the genitals or buttocks of or the *breasts* of any person who acts as a *waiter,* waitress or *entertainer.*"[1] (Pen. Code, § 318.5.) (Italics added.) Hence, it encompasses the prohibition of the exposure of the "breasts" of a male entertainer. That the draftsman intended to include the male entertainer is borne out by the specific reference to the "breasts of any *female* participant" in the following section 318.6; the inclusion of the male, as distinguished from the female, in section 318.5, must have been deliberate. The broad, loose language of that section would cover such entertainers as the shirtless crooner, the member of a rock band, the principal character in Eugene O'Neil's "Emperor Jones," and an endless list of bare-breasted actors. The lengths to which the statute apparently goes in the regulation of entertainment leads us into a legalistic theater of the absurd.

The ordinances cannot stand unless the state legislation protects them against the attack that they invade the area of regulation of sexual activities preempted by the state, (*In re Lane* (1962) 58 Cal.2d 99 [22 Cal. Rptr. 857, 372 P.2d 897]; *People* v. *Hansen* (1966) 245 Cal.App.2d 689 [54 Cal.Rptr. 311].) The state legislation is vulnerable, as I have explained, to the charge of overbreadth; if it fails, the ordinances, presumably, cannot stand. But I shall proceed to assume that the ordinances do not succumb to this attack; I shall weigh them independently in the constitutional

---

[1] "breast. . . . 1. The fore or ventral part of the body, between the neck and the abdomen; the front of the chest; as, the *breast* of a man." (Webster's New Internat. Dict. (2d ed. 1957) p. 330.)

scales; I shall point out why the ordinances as applied to female and male entertainers, dangerously intrude upon constitutional protections.

The principle that communicative entertainment constitutes a protected mode of expression under the First Amendment is a basic proposition not subject to question. That protection dates from the decision of the United States Supreme Court in *Joseph Burstyn, Inc.* v. *Wilson* (1952) 343 U.S. 495 [96 L.Ed. 1098, 72 S.Ct. 777], which struck down a New York statute banning sacrilegious motion pictures. The court stated that: "It cannot be doubted that motion pictures are a significant medium for the communication of ideas. They may affect public attitudes and behavior in a variety of ways, ranging from direct espousal of a political or social doctrine to the subtle shaping of thought which characterizes all artistic expression. The importance of motion pictures as an organ of public opinion is not lessened by the fact that they are designed to entertain as well as to inform." (343 U.S. at p. 501 [96 L.Ed. at pp. 1105-1106].) Subsequent decisions confirmed that the First Amendment protects films attacked for portrayal of nudity or sexual behavior. (*Jacobellis* v. *Ohio* (1964) 378 U.S. 184 [12 L.Ed.2d 793, 84 S.Ct. 1676] ["Les Amants"]; *United States* v. *A Motion Picture Film* (2d Cir. 1968) 404 F.2d 196 ["I Am Curious—Yellow"].)

The reach of the First Amendment does not depend upon the recordation of a performance on film; the live theatre is a medium of social expression equal in emotional appeal to the motion picture. Thus the courts have extended the protection of the First Amendment to dramatic stage productions (*Barrows* v. *Municipal Court* (1970) 1 Cal.3d 821 [83 Cal. Rptr. 819, 464 P.2d 483] ["The Beard"]), to musical shows (*P.B.I.C., Inc.* v. *Bryne* (D.Mass. 1970) 313 F.Supp. 757, vacated to consider mootness (1971) 401 U.S. 987 [28 L.Ed.2d 526, 91 S.Ct. 1222] ["Hair"]), to guerrilla theater (*Schacht* v. *United States* (1970) 398 U.S. 58 [26 L.Ed.2d 44, 90 S.Ct. 1555]), to topless dancing (*In re Giannini* (1968) 69 Cal.2d 563 [72 Cal.Rptr. 655, 446 P.2d 535]) and to burlesque (*Hudson* v. *United States* (D.C.App. 1967) 234 A.2d 903; *Adams Theatre Co.* v. *Keenan* (1953) 12 N.J. 267 [96 A.2d 519, 520] (dictum)).[2]

---

[2]This protection does not extend to bar suppression of obscene performances. But "obscenity" is a term of art in constitutional law. It cannot be equated with nudity (see *People* v. *Noroff* (1967) 67 Cal.2d 791 [63 Cal.Rptr. 575, 433 P.2d 479]) or vulgarity (*Cohen* v. *California* (1971) 403 U.S. 15 [29 L.Ed.2d 284, 91 S.Ct. 1780]). A performance is obscene only if it violates Penal Code section 311, which defines obscenity as follows: " 'Obscene matter' means matter, taken as a whole, the predominant appeal of which to the average person, applying contemporary standards, is to prurient interest, i.e., a shameful or morbid interest in nudity, sex, or excretion;

This court ruled on the subject of nude entertainment in *In re Giannini* (1968) *supra,* 69 Cal.2d 563, which involved criminal charges against a topless dancer and her manager. Overturning convictions of lewd exposure (Pen. Code, § 314, subd. 1) and lewd conduct (Pen. Code, § 647, subd. (a)), we held in that case, that "[t]he performance of a dance for an audience constitutes a method of expression that, in the absence of proof of obscenity, warrants the protection of the First Amendment." (69 Cal.2d 563, 567.) We reasoned that: ". . . *all* forms of communication, not merely the expression of concrete and definite ideas, *potentially* receive First Amendment protection. 'We do not accede to appellee's suggestion that the constitutional protection for a free press applies only to the exposition of ideas. The line between the informing and the entertaining is too elusive for the protection of that basic right. . . . Though we see nothing of any possible value to society in these magazines, they are as much entitled to the protection of free speech as the best of literature.' (*Winters* v. *New York* (1948) 333 U.S. 507, 510 [92 L.Ed. 840, 847, 68 S.Ct. 665].) 'Also encompassed [within the right of freedom of speech] are amusement and entertainment as well as the exposition of ideas.' (*Weaver* v. *Jordan* (1966) 64 Cal.2d 235, 242 [49 Cal.Rptr. 537, 411 P.2d 289].)' In the light of this approach, the performance of the dance indubitably represents a medium of protected expression." (69 Cal.2d at pp. 569-570.) (Fns. omitted; italics in original.)

We pointed out in *Giannini* that, "[o]f course, a conclusion that Iser's theatrical dance prima facie gains a First Amendment protection does not affect the central question presented in this case; whether her performance loses this privileged status because it is obscene." (69 Cal.2d at pp. 570-571.) Obscenity, however, requires proof that the material presented affronts contemporary community standards; since the state presented no evidence of community standards, we concluded that the convictions must be reversed.

In *Barrows* v. *Municipal Court* (1970) 1 Cal.3d 821 [83 Cal.Rptr. 819, 464 P.2d 483], we issued a writ of prohibition to prevent a criminal prosecution based on a simulated sexual act in a play. We stated as a primary proposition "that live plays performed in a theater before an audience are entitled to the same protection under the First Amendment as motion pictures . . . magazines . . . and newspapers . . . ." (1 Cal.3d

---

and is matter which taken as a whole goes substantially beyond customary limits of candor in description or representation of such matters; and is matter which taken as a whole is utterly without redeeming social importance." (See also *Memoirs* v. *Massachusetts* (1966) 383 U.S. 413, 418 [16 L.Ed.2d 1, 5, 86 S.Ct. 975].)

at p. 824.)[3] Later in the opinion we declared that "Dramatic license would not supply indulgence for the actual murder of the villain, the rape of the heroine, or the maiming of the hero. Neither do we intend to imply, however, that conduct or speech in a theatrical production is to be judged by the same standards as conduct or speech occurring on the street or other public place. *Giannini* makes it clear that 'acts which are unlawful in a different context, circumstance, or place, may be depicted or incorporated in a stage or screen presentation and come within the protection of the First Amendment, losing that protection only if found to be obscene.' (69 Cal.2d at p. 572.) We particularly reaffirm this portion of the decision in *Giannini*, for any more restrictive rule could annihilate in a stroke much of the modern theater and cinema. The loss to culture and to First Amendment rights would be equally tragic." (1 Cal.3d at pp. 830-831.)

The recent decision of the United States Supreme Court in *California* v. *LaRue* (1972) 409 U.S. 109 [34 L.Ed.2d 342, 93 S.Ct. 390], adheres to this line of precedent. *LaRue* passed upon a regulation which, in addition to banning live or filmed sexual acts, prohibited the actual or simulated display of the genitals by entertainers in bars and nightclubs. Although observing that the prohibited performances "partake more of gross sexuality than of communication" (409 U.S. at p. 118 [34 L.Ed.2d at pp. 351-352]), the court found a sufficient communicative element to declare its agreement with the district court that "these regulations on their face would proscribe some forms of visual presentation which would not be found obscene under *Roth* and subsequent decisions of this Court." (409 U.S. at p. 114 [34 L.Ed.2d at p. 349].) The court explained, however, that the issue arises "in a context of licensing bars and nightclubs to sell liquor by the drink." (*Ibid.*) Noting that "the broad sweep of the Twenty-first Amendment has been recognized as conferring something more than the normal state authority over public health, welfare, and morals" (*ibid.*), the court sustained the department's conclusion "that the sale of liquor by the drink and lewd or naked dancing and entertainment should not take place simultaneously." (*Ibid.*)

The court proceeded to hold that "While we agree that at least some of

---

[3]*Barrows'* reference to the First Amendment protection accorded to "live plays performed in a theater" (1 Cal.3d at p. 824) may account for the exception in Penal Code sections 318.5 and 318.6, and in the ordinances before us, for performances in "a theater, concert hall, or similar establishment which is primarily devoted to theatrical performances." But nothing in *Barrows* suggests that a play ceases to be protected expression if presented in some other building, nor that to qualify for such protection the "theater" must have moveable scenery and seats which bolt to the floor. (Cf. *Schacht* v. *United States* (1970) *supra*, 398 U.S. 58 [outdoor "guerrilla theater"].)

the performances to which these regulations address themselves are within the limits of the constitutional protection of freedom of expression, *the critical fact is that California has not forbidden these performances across the board*. It has merely proscribed such performances in establishments which it licenses to sell liquor by the drink." (409 U.S. at p. 118 [34 L.Ed.2d at p. 352].) (Italics added.)

In the present case, the critical fact is that Orange and Sacramento Counties have forbidden nude entertainment across the board, without respect to whether the place of entertainment serves alcoholic beverages. The majority's attempted distinction of *LaRue* upon the ground that it distinguishes between "movies" and "live entertainment" not only directly contravenes the language of *LaRue* but also violates common sense. The extraordinary powers conferred upon the state by the Twenty-first Amendment, which saved the alcoholic beverage regulations from unconstitutionality in *LaRue*, cannot save the ordinances before us now. I conclude that these ordinances on their face proscribe some forms of visual presentation which may properly claim protection under the First Amendment, and consequently that the ordinances must be found unconstitutional.

The message of all of the decisions is clear: except when exercising its extraordinary powers under the Twenty-first Amendment, the state may not ban nonobscene entertainment. But the majority believe they have found a road around this formidable constitutional protection. Entertainment, they assert, can be dichotomized into speech and conduct; the state need not touch speech, but by barring conduct associated with that speech, the state may effectively proscribe entertainment.

The adoption of this theory would let the censor loose without constitutional restriction to condemn at will any and all communicative entertainment. While avoiding reference to the actor's speech, the state could ban his gestures, his costuming (or amount of costuming), the positioning of the actors, the lighting of the stage, or whatever other "conduct" it chooses. Nor is the logic of the majority opinion confined to entertainment in bars or restaurants; it applies equally to the legitimate theater and to the motion picture. Neither is the logic of the opinion confined to the subject of nudity. If a county seeks to prohibit entertainers, or participants in a public demonstration, from wearing long hair, unfashionable dress, or uniforms (cf. *Schacht* v. *United States* (1970) *supra*, 398 U.S. 58), the majority opinion can be construed to uphold such legislation.

The majority opinion, indeed, dangerously destroys long-held, laboriously built constitutional protections of the communicative arts. As of this

writing a metropolitan newspaper carries a full front page picture of bare-breasted male and female dancers of Senegal who are performing in the San Francisco Bay Area.[4] Similar productions are the Ballet Africains and a myriad of other ethnic dances. The majority's metaphysical severance of speech from "conduct," (or the extent of costumes) would permit the prohibition of such "nude" dancing. Of course the majority hasten to assure us that the ordinances, as drafted, do not regulate such performances if given in a "theater," but, assuming that questionable position, we can find no similar limitation in the majority's rationalization for their ruling. The rationalization, the ruling, the holding, is that "nude" conduct can be differentiated from speech or communication and, as such, subjected to regulation or prohibition. At one stroke of the pen the majority have thereby torn down the constitutional protections of the communicative arts, exposing the drama, the motion picture, the dance, the opera, the visual arts, sculpture, and communicative entertainment in general, to unbridled censorship. The careful delineation of constitutionally protected expressions as opposed to those that are obscene under the decisions is apparently no longer viable. The rulings are circumvented by the new conduct-communication fictitious dualism.

If we accept the conduct-speech dichotomy, enabling government thereby to proscribe "conduct," what remains of constitutional protection for communication of ideas? The Legislature could enact legislation prohibiting the "conduct" or performance of any play, opera or ballet that the censor deemed "subversive" or "revolutionary." Under the theory of the majority, the "speech" in the play, opera or ballet would not be proscribed but only *the conduct,* consisting of the *acting* and the *physical movements* of the performers or "entertainers." The constitutional protection of free speech as heretofore developed in the cases would not apply. If the majority's destructive doctrine were to be followed, the First Amendment's protections of the communicative arts as expressions of free speech would be obliterated.

The fallacy of the majority's attempt to split speech from action is excellently expressed in the dissenting opinion of Justice Marshall in *LaRue.* He observed that "If . . . movies, plays, and dance enjoy constitutional protection, it follows, ineluctably I think, that their component parts are protected as well. It is senseless to say that a play is 'speech' within the meaning of the First Amendment, but that the individual gestures of the actors are 'conduct' which the State may prohibit. The State may

---

[4]"This World," edited by the San Francisco Chronicle, a section of the San Francisco Sunday Examiner and Chronicle, March 11, 1973, page 1.

no more allow movies while punishing the 'acts' of which they are composed than it may allow newspapers while punishing the 'conduct' of setting type."[5] (409 U.S. at p. 130 [34 L.Ed.2d at p. 359].)

In like vein I suggest that the costuming, or lack of costuming, of an entertainer or dancer is an integral component of the entertainment or dance.[6] To require the entertainer to wear costuming inappropriate or hampering to his role is simply an indirect way of banning the entertainment.

Barred by the present law of obscenity from sustaining the ordinances, the majority seize upon a doctrine that is not applicable to the problem at all. The majority turn to a decision, *United States* v. *O'Brien* (1968) 391 U.S. 367 [20 L.Ed.2d 672, 88 S.Ct. 1673], that involves symbolic free speech, a case that is entirely factually distinguishable from the present one, and that develops a theory alien to the instant issue.

The facts of *O'Brien* do not remotely resemble the present case. O'Brien was accused of violating an amendment to the Universal Military Training and Service Act of 1948 prohibiting the knowing destruction of a draft card. (50 U.S.C. § 462(b).) This amendment, the court stated, "deals with conduct having no connection with speech. It prohibits the knowing destruction of certificates issued by the Selective Service System, and there is nothing necessarily expressive about such conduct. The Amendment does not distinguish between public and private destruction, and it does not punish only destruction engaged in for the purpose of expressing views." (391 U.S. at p. 375 [20 L.Ed.2d at p. 679].) Concluding that the amendment was directed solely at the proscription of conduct unrelated to protected speech, the court upheld the constitutionality of the enactment on its face. (See 391 U.S. at pp. 381-382 [20 L.Ed.2d at pp. 682-683].)

O'Brien contended, however, that he burned his draft card to *protest* against war, and consequently that the act as applied to him was unconstitutional. He claimed that his protest came under the rubric of free speech because it was "*symbolic* speech." The court stated that it could not "ac-

[5] I find nothing in the majority opinion in *LaRue* to suggest that the majority there rejected Justice Marshall's analysis; to the contrary, the majority clearly recognize that the regulations at issue in *LaRue* restrict protected expression.

[6] Cf. *Schacht* v. *United States* (1970) *supra*, 398 U.S. 58, which held unconstitutional a federal statute which provided that "while portraying a member of the Army, Navy, Air Force, or Marine Corps, an actor in a theatrical or motion picture production may wear the uniform of that armed force if the portrayal does not tend to discredit that armed force." (10 U.S.C. § 772(f).)

cept the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." (391 U.S. at p. 376 [20 L.Ed.2d at p. 679].) Yet the court did not entirely exclude symbolic speech from the protection of the First Amendment. It· concluded, instead that incidental governmental restriction upon symbolic speech was permissible, but only when essential to further an important or substantial governmental interest. (391 U.S. at pp. 376-377 [20 L.Ed.2d at pp. 679-680].)

The grounds for distinction between *O'Brien* and the present case are manifold. *O'Brien* involved a law which prohibited burning of draft cards wherever that conduct occurred, and which did not on its face aim at regulation of protected speech; the ordinances at bar proscribe nudity only when it occurs in the context of protected communicative entertainment. The act of burning a draft card bears no integral relation to protected communication; the costuming of an entertainer is unquestionably an integral part of the entertainment. The language in *O'Brien* on which the majority rely discusses the constitutionality of a law regulating conduct *as applied* to an act of "symbolic speech"; the present case concerns the constitutionality on its face of ordinances regulating protected activity.

Finally, and most important, in *O'Brien* the court extended limited First Amendment protection to "symbolic speech"—conduct which, normally noncommunicative, is invested with symbolic significance by the protestant. The present case has nothing to do with symbolic speech. It has nothing to do with protest. It concerns communicative entertainment, an activity which heretofore has been entitled not to limited but to *full protection* under the First Amendment. The majority opinion stands *O'Brien* on its head, transforming that case, which involved the extension of the First Amendment into the peripheral region of symbolic speech, into a weapon which renders the protected region of communicative entertainment vulnerable to the inroads of censorship.

I come now to the second step in the majority's analysis.

The majority opinion very reluctantly assumes for the sake of argument that "there may be in some instances a 'communicative element' in conduct falling within the instant ordinances sufficient to bring into play the First Amendment" (at p. 427)—an assumption that I believe is compelled by the logic of the cases and the language of *LaRue*. It then sets out to evaluate the ordinances according to the fourfold test stated in *O'Brien*, and, after a brief and cursory examination, approves the ordi-

nances. I shall develop the view that the majority misunderstand and misapply the *O'Brien* standards and that, under a proper application of those tests, the present ordinances fail on at least three of the four measures.

I reiterate the language of the Supreme Court in *O'Brien*: "This Court has held that when 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms. To characterize the quality of the governmental interest which must appear, the Court has employed a variety of descriptive terms: compelling; substantial; subordinating; paramount; cogent; strong. Whatever imprecision inheres in these terms, we think it clear that a government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." (391 U.S. at pp. 376-377 [20 L.Ed.2d at pp. 679-680].) (Fns. omitted.)

This language establishes a two-level test. Laws which do not affect the communicative element of conduct are constitutional if they fall within the police power or other authority of the state. Laws which involve incidental limitations on First Amendment freedoms, however, must meet a more exacting standard. The mere existence of a governmental interest in regulating such conduct will not suffice; that interest must be a substantial or important interest, unrelated to the suppression of free expression, and the law must not restrict free expression more than the minimum necessary to further the state interest.

This two-level analysis bears a close similarity to the approach used by this court and the Supreme Court in equal protection cases. "In the typical equal protection case the classification need only bear a rational relationship to a conceivable legitimate state purpose." (*Curtis* v. *Board of Supervisors* (1972) 7 Cal.3d 942, 951-952 [104 Cal.Rptr. 297, 501 P.2d 537].) "On the other hand, in cases involving 'suspect classifications' or touching on 'fundamental interests,' . . . the court has adopted an attitude of active and critical analysis, subjecting the classification to strict scrutiny. [Citations omitted.] Under the strict standard applied in such cases, the state bears the burden of establishing not only that it has a *compelling* interest which justifies the law but that the distinctions drawn by the law are *necessary* to further its purpose." (*Westbrook* v. *Mihaly* (1970) 2

Cal.3d 765, 784-785 [87 Cal.Rptr. 839, 471 P.2d 487], vacated on other grounds (1971) 403 U.S. 915 [29 L.Ed.2d 692, 91 S.Ct. 2224].)[7]

Throughout both the equal protection cases and *O'Brien* and its predecessors runs a common theme: when a law touches upon a fundamental interest—and protected First Amendment communication is clearly a fundamental interest—the courts must subject that law to close and critical scrutiny, must determine what state interest the law will further, and must measure that interest to see if it can properly be described as of "compelling," "substantial," or "important" character. And then the courts must further examine the law to be sure that it infringes upon fundamental rights no more than absolutely necessary to further the interest of the state.

Mindful of our obligation to subject these ordinances to an active and critical analysis, I take up the four tests set out in *O'Brien*. The *first test* is that the law must be *within the constitutional power of government*. Unlike the majority, I find it quite doubtful whether the government has an inherent power to regulate nude entertainment in bars and restaurants. I have no doubt that it may regulate nudity on public streets, where such behavior may offend bystanders; on the other hand, the government asserts no interest in banning private nudity, and probably lacks the power to do so. Bars and restaurants fall in between these extremes. Although not as private as individual homes, nevertheless the nudity within bars and restaurants is not visible from public streets or sidewalks. The customers who enter such establishments do so voluntarily, knowing they will view nude entertainment, and choosing to do so. There appears to be no evidence that either the customers or the entertainers suffer the slightest harm from the experience. The majority's assumption that the state has the power to ban consensual adult behavior, harmful neither to participants nor bystanders, on the ground that some nonparticipants deem that behavior immoral, is certainly open to dispute.[8]

I shall, however, assume for the sake of argument that the state has

---

[7]Accord: *Serrano* v. *Priest* (1971) 5 Cal.3d 584, 597 [96 Cal.Rptr. 601, 487 P.2d 1241, 41 A.L.R.3d 1187]; see *Weber* v. *Aetna Casualty & Surety Co.* (1972) 406 U.S. 164, 172-173 [31 L.Ed.2d 768, 777-778, 92 S.Ct. 1400]; *Purdy & Fitzpatrick* v. *State of California* (1969) 71 Cal.2d 566, 578-579 [79 Cal.Rptr. 77, 456 P.2d 645, 38 A.L.R.3d 1194].

[8]The *LaRue* majority's statement that "the broad sweep of the Twenty-first Amendment has been recognized as conferring something more than the normal state authority over public health, welfare, and morals" (409 U.S. at p. 114 [34 L.Ed.2d at pp. 349-350]), followed by its reliance upon the Twenty-first Amendment to sustain the regulations, implies that the majority also doubts that the "normal state authority over public health, welfare, and morals" is sufficient to justify regulation of nude entertainment.

some interest in regulating nude entertainment in bars and restaurants, so that we may proceed to the *second issue* under the *O'Brien* test: whether that state interest can fairly be described as *"substantial"* or *"important."* The majority opinion asserts that "it cannot be gainsaid that the regulations further 'an important or substantial governmental interest' [citing *O'Brien,* 391 U.S. at p. 377 (20 L.Ed.2d at p. 680)] in promoting public morals." (*Ante,* at p. 427.) But the rest of the majority opinion does not discuss that grand abstraction: the state's interest in promoting a moral society. The opinion, instead, discusses the state's interest in regulating nude conduct. While I do not dispute that the promotion of the truly moral society is a laudable public purpose, I can and do maintain that banning nude entertainment will not contribute in any significant degree to this end; or, in other words, that the state's interest in banning such entertainment cannot be considered a substantial or important interest.

Persons viewing or creating nude entertainment are adults who voluntarily choose to do so.[9] Presumably the audience derives some satisfaction from the performance or they would not attend; presumably the performers derive some benefit or they would not perform. Neither are harmed. The performance may be tawdry and vulgar, although the ordinances are not limited to performances of such character; in any case the state's interest in elevating the public taste is among the least substantial of its interests.[10] The majority assert that bars offering nude entertainment may blight a neighborhood; so may auto junkyards; the solution to both cases lies in proper zoning.

Indeed, the majority's argument is reduced to the assertion that whenever the majority of voters of a county, or their representatives, deem certain behavior immoral, it follows ipso facto that (a) the behavior really is immoral,[11] (b) the state has an interest in suppressing the behavior,

[9]See *Boreta Enterprises, Inc.* v. *Department of Alcoholic Beverage Control* (1970) 2 Cal.3d 85, 102 [84 Cal.Rptr. 113, 465 P.2d 1]; *In re Giannini* (1968) 69 Cal.2d 563, 575-576, fn. 8 [72 Cal.Rptr. 655, 446 P.2d 535]; *Robins* v. *County of Los Angeles* (1966) 248 Cal.App.2d 1, 12 [56 Cal.Rptr. 853].

[10]As we stated in *People* v. *Noroff* (1967) *supra,* 67 Cal.2d 791, 796-797, and reiterated in *Boreta Enterprises, Inc.* v. *Department of Alcoholic Beverage Control* (1970) *supra,* 2 Cal.3d 85, 102-103, fn. 27: "The United States Supreme Court has wisely recognized that ultimately the public taste must determine that which is offensive to it and that which is not; a public taste that is sophisticated and mature will reject the offensive and the dull; it will in its own good sense discard the tawdry, and once having done so, the tawdry will disappear because its production and distribution will not be profitable. Understandably, such maturity does not come quickly or easily; and, in a time when the strictures of Victorianism have been replaced by wide swings of extremism, it seems hopelessly remote."

[11]In *Boreta Enterprises, Inc.* v. *Department of Alcoholic Beverage Control* (1970) *supra,* 2 Cal.3d 85, we noted that "the courts of this state have recognized the in-

and (c) that interest is so compelling, so substantial and important, that it justifies restrictions on First Amendment communication. This non-sequitur recitation is not the sort of active and critical analysis required in cases which touch upon fundamental rights: to the contrary, it reduces to an assertion that the mere fact that a county wants to ban nude entertainment somehow proves that such legislation is constitutional.

The *third requirement* under *O'Brien* is that the governmental interest be *unrelated to the suppression of free expression.* As I pointed out earlier in this opinion, the ordinances at bar do not ban nudity generally: they regulate the costuming (nudity or simulated nudity) of entertainers. Thus the governmental interest underlying these ordinances, whatever its exact dimensions, must be an interest in prohibiting a *type of entertainment.* Such an interest cannot be classed as one unrelated to the suppression of free expression.

The *fourth test* is that the law impose *no greater restriction than is essential* to the furtherance of an important or substantial governmental interest. This test requires us to identify the governmental interest in question. If it is to prohibit nude entertainment, then the ordinances go further than necessary in banning the simulation of nudity; if it is to avoid neighborhood blight, they go further than needed in banning such entertainment regardless of location; if it is to eliminate the tawdry and vulgar, they go too far in banning all nude entertainment of whatever sophistication or refinement. Nowhere in the majority opinion can I discern a state interest which so closely parallels the ordinances that they could be said to proscribe no more than is necessary to further that interest.

If compelled to describe the state's interest in regulating nude entertainment before voluntary adult audiences, I should be constrained to use the antonyms of the terms set out in *O'Brien;* I would describe that interest as "noncompelling," "unimportant," "insignificant," and "dubious." I would conclude that such an interest does not justify any restriction upon protected expression.

conclusive and indecisive state of the consensus of society regarding the propriety and morality of public and quasi-public displays of female breasts" (2 Cal.3d at p. 101): and again that there exists "an obvious lack of societal consensus as to the morally permissible degree of diaphanous raiment and public deshabille" (2 Cal.3d at p. 102). I conclude from these observations that there is a "lack of societal consensus" as to whether measures prohibiting the display of female breasts, or any other portion of the human body, will have any tendency to promote the public morals.

In conclusion, I address a brief comment to the objectives of these ordinances. We live in an era in which political censorship is, fortunately, rare, and religious censorship virtually nonexistent; the hand of the censor today is largely directed at preventing or impeding the communication of sexual ideas and emotions. The censor has little evidence that such communication is harmful, and little rational basis to term it immoral, but sometimes neither evidence nor reason can prevail with a man imprisoned in his own prejudices. He can, with greater justice, describe much sexual communication as vulgar—although the courts can hardly serve as the appointed monitors to stamp out "vulgarity." (*Cohen* v. *California* (1971) 403 U.S. 15, 25 [29 L.Ed.2d 284, 293-294, 91 S.Ct. 1780].)[12]

Nevertheless, the courts have permitted the censorship of communication or entertainment to a limited extent by holding that obscenity is not within the protection of the First Amendment. The Legislature, pursuant to this permission, has in Penal Code section 311.6 declared that obscene live conduct before an audience is a misdemeanor. But both the courts and the Legislature have been careful to assure that censorship stays within bounds by insisting that conduct is not obscene unless it exceeds customary limits of candor and lacks redeeming social importance.

If the present ordinances merely proscribe obscene entertainment, they would duplicate Penal Code section 311.6 and accomplish no useful purpose. These ordinances, however, serve a more invidious end: to ban nude entertainment even when such entertainment does not exceed customary limits of candor or does possess redeeming social importance. In so doing they destroy the balance struck by the courts between the interest

---

[12]The history of the *Cohen* case is of some interest on the issue of distinguishing expression from conduct. Cohen was convicted of disturbing the peace after he walked through the corridor of the Los Angeles County Courthouse wearing a jacket bearing the words "Fuck the Draft." The Court of Appeal upheld the conviction, reasoning that Cohen's behavior consisted of both speech and nonspeech elements which, under the facts of that case, could properly be punished as "offensive conduct" under Penal Code section 415. (*People* v. *Cohen* (1969) 1 Cal.App.3d 94, 103-104 [81 Cal.Rptr. 503].) We denied a petition for hearing. The United States Supreme Court granted certiorari and reversed the conviction. (*Cohen* v. *California* (1971) *supra,* 403 U.S. 15.) Its opinion states: "[W]hile the particular four-letter word being litigated here is perhaps more distasteful than most others of its genre, it is nevertheless often true that one man's vulgarity is another's lyric. Indeed, we think it is largely because governmental officials cannot make principled distinctions in this area that the Constitution leaves matters of taste and style so largely to the individual." (403 U.S. at p. 25 [29 L.Ed.2d at p. 294].) I suggest that the majority in the present case are making the same error as did the Court of Appeal in *Cohen*: namely, assuming that vulgar expression is somehow not expression at all, but merely unexpressive conduct.

of the people in open communication and the lesser interest of the state in censoring obscenity; they extend the criminal sanction into a region of protected expression.[13]

Mosk, J., concurred.

The petitions of the respondents in No. 29917 and of the appellants in Nos. 7904 and 7905 for a rehearing were denied May 30, 1973. Tobriner, J., and Mosk, J., were of the opinion that the petitions should be granted.

---

[13]I dissent also from the majority's resolution of the equal protection issue, which resolution rests upon the majority's mistaken premise that the ordinances at issue here do not touch upon any constitutionally protected right.