[Nos. 42650, 42651.   En Banc.   April 25, 1974.]

THE CITY OF SEATTLE, *Respondent,* v. TERESA NATALE MARSHALL *et al., Appellants.*

*Victor V. Hoff,* for appellants.

*A. L. Newbould, Corporation Counsel,* and *Helen Wilson, Assistant,* for respondent.

HUNTER, J.—This is a consolidation of appeals from two

separate convictions: (1) the appeal of Teresa Natale Marshall for conviction of directly participating in the asserted violation of Seattle Code 12.11.220; and (2) the appeal of James Lee Verdon for the conviction of aiding and abetting Teresa Natale Marshall and others in the asserted violation of the ordinance.

The appellants (defendants) were charged with violating the following ordinance:

> 12.11.220 Indecent exposure. It is unlawful for any person to appear in a state of nudity, or in any indecent or *lewd* dress, or make any indecent exposure of his person, or to expose his private parts to public view, or be guilty *of any lewd act or behavior in any place exposed to public view.* (Ord. 16046 § 21; May 23, 1907).

(Italics ours.)

The facts which are undisputed are as follows. On December 7, 1971, the defendant, Teresa Natale Marshall, while on the stage of the New Paris Theater, removed all of her clothing and while she was naked, spread her legs toward an all male adult audience and exposed her private parts to that audience. In addition, she laid on her back and then on her stomach and simulated a "bump and grind" sex act. On February 4, 11 and 12, 1972, and March 9, 1972, women on the stage of the New Paris Theater stripped until they were naked and while naked, simulated a sex act either on the stage or on a large padded stool that was on the stage, somersaulted and landed with their legs spread toward the audience, and exposed their private parts to an all male adult audience while sitting on the edge of the stage.

During the above times the defendant, James Lee Verdon, was the manager of the theater and was responsible for hiring and firing the above mentioned women, counseled them about their performance, and was responsible for deciding whether they would remove their G-strings during the performance. The New Paris Theater in Seattle admits the general adult public to any of its performances upon payment of a monetary fee.

█ The threshold question in this case is whether the above conduct on the stage of the New Paris Theater was obscene. The United States Supreme Court, in *Miller v. California*, 413 U.S. 15, 37 L. Ed. 2d 419, 93 S. Ct. 2607 (1973), defines obscenity as follows on page 24-25:

[C]onduct . . . [or] works which, taken as a whole, appeal to the prurient interest in sex, which portray sexual conduct in a patently offensive way, and which, taken as a whole, do not have serious literary, artistic, political, or scientific value.

The basic guidelines for the trier of fact must be: (a) whether "the average person, applying contemporary community standards" would find that the work, taken as a whole, appeals to the prurient interest, *Kois v. Wisconsin, supra*, [408 U.S. 229 (1972)] at 230, quoting *Roth v. United States, supra*, [354 U.S. 476 (1957)] at 489; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value. We do not adopt as a constitutional standard the "*utterly* without redeeming social value" test of *Memoirs v. Massachusetts*, 383 U.S., at 419; . . .

█ One needs no expert testimony for it to be concluded that this conduct that took place in the New Paris Theater comes squarely within the above definition, particularly when applying the basic guidelines enunciated. There was no plot to this base conduct; there was no communication of ideas other than a prurient sex interest. It was a pure exhibition to portray an interest in sex conduct in an offensive way without any semblance of literary, artistic, political or scientific value. The conduct was obscene on its face. It is obscenity per se. In *Morris v. United States*, 259 A.2d 337, 341 (D.C. App. 1969), that court quoted the following language from the Court of Special Appeals of Maryland, defining obscenity per se: (At that time the element of no redeeming social value, and the requirement of national community standards in the *Roth* and *Memoirs* definition were in effect. *Roth v. United States*, 354 U.S. 476, 1 L. Ed. 2d 1498, 77 S. Ct. 1304 (1957), and *A Book*

*Named "John Cleland's Memoirs of a Woman of Pleasure"*
*v. Attorney General,* 383 U.S. 413, 16 L. Ed. 2d 1, 86 S. Ct.
975 (1966).)

> There is no desire to portray [it] in pseudo-scientific or
> "arty" terms. It can be recognized by the insult it
> offers, invariably, to sex and to the human spirit. It
> goes substantially beyond customary limits of candor
> and deviates from society's standards of decency in the
> representation of the matters in which it deals. It has a
> patent absence of any redeeming social value; it speaks
> for itself and screams for all to hear that it is obscene.
> It is not designed to be a truthful description of the
> basic realities of life as the individual experiences
> them but its main purpose [is] to stimulate erotic re-
> sponse.  *  *  *  No proof, other than the viewing of
> it, is required to determine if it is, in fact, obscene.

(Footnotes omitted.)
That court then said on page 341:

> It is clear to this court that where obscenity per se is
> involved, the prosecution is not required to offer any
> evidence (beyond the material or performance itself)
> that it is pornographic or obscene or that it is below the
> national community standards. . . .   In other words,
> if reasonable men could not differ and they could come to
> but one conclusion, *i.e.,* that the material or performance
> is sexually morbid, grossly perverse, and bizarre, with-
> out any artistic or scientific purpose or justification, then
> the Government on its case-in-chief need not offer any
> evidence of National community standards.

(Citations omitted.)
We hold that the conduct on the stage of the New Paris
Theater on the occasion heretofore outlined was obscene
per se; that reasonable men could not differ that the ele-
ments essential to constitute obscenity existed in the con-
duct of the performers in this case, and that no opinion
evidence is necessary to support such a conclusion. In *State
v. J-R Distribs., Inc.,* 82 Wn.2d 584, 623, 512 P.2d 1049
(1973), we stated:

> "[H]ard core pornography" can and does speak for itself
> on the question of obscenity, according to *Paris Adult*

*Theatre I v. Slaton, supra;* [413 U.S. 49, 37 L. Ed. 2d 446, 93 S. Ct. 2628 (1973)] . . . No amount of testimony by anthropologists, sociologists, psychiatrists, or psychologists could have added anything to the trial court's ability to determine that the materials failed to comply with any contemporary community standards related to sexual matters.

(Citations omitted.) The facts in this case do not constitute obscenity in the same degree as in *State v. J-R Distribs., Inc., supra,* but the rule therein stated should nevertheless be applicable.

That the performance in the New Paris Theater was obscene is further supported by the case of *Adams Theatre Co. v. Keenan,* 12 N.J. 267, 275, 96 A.2d 519 (1953), wherein Justice Brennan described a class of burlesque to be *obscene,* which clearly encompasses the facts of the instant case:

In contrast, that which has been termed "modern burlesque" has been described as

"*a plotless musical entertainment consisting of a series of unrelated episodes and dances, all with the purpose of depicting or suggesting sexual subjects or objects.* The one outstanding characteristic of modern burlesque is the fact that it is completely sex-centered. It has some low comedy and occasionally some humor, but the principal subject of both is sex. * * * The *piece de resistance* is the girl who disrobes, partially or entirely, and this act varies with the political season and the locality. * * * If burlesque of today is metropolitan, so also it is vice, and needs to be thought of in that light, as an aspect of social pathology. If vice implies a sense of antagonism toward existing mores, a purveying of sex in a vicarious, professional and promiscuous fashion, then burlesque is just that. * * * Although the operator may not be willing to say so to an inquirer, usually adopting a sanctimonious air, he knows, and everything in his theatre indicates he knows, that he is giving a sex show, sans excuses, sans philosophy and above all, sans clothes. He is, in that sense a professional purveyor of sex." *Dressler, Burlesque as a Cultural Phenomenon* (1937).

*A burlesque show answering the latter description may well be considered outrightly lewd and indecent.*

(Italics ours.)

■ It is contended that the Seattle ordinance is a public view ordinance that relates to public view of conduct in the streets, and that a theater is not a place intended to be covered by the ordinance. We disagree. There is no language in the ordinance to support this limitation of its application.

It is further contended that the Seattle ordinance has not been violated on the theory that the performance in the New Paris Theater was not a public place and thus the proscribed conduct was not exposed to public view. This was answered emphatically in the negative by the United States Supreme Court in *Paris Adult Theatre I v. Slaton,* 413 U.S. 49, 37 L. Ed. 2d 446, 93 S. Ct. 2628 (1973), involving a case of consenting adults with paid admissions. The court stated on page 68:

Finally, petitioners argue that conduct which directly involves "consenting adults" only has, for that sole reason, a special claim to constitutional protection. Our Constitution establishes a broad range of conditions on the exercise of power by the States, but for us to say that our Constitution incorporates the proposition that conduct involving consenting adults only is always beyond state regulation, is a step we are unable to take. *Commercial exploitation of depictions, descriptions, or exhibitions of obscene conduct on commercial premises open to the adult public falls within a State's broad power to regulate commerce and protect the public environment.* The issue in this context goes beyond whether someone, or even the majority, considers the conduct depicted as "wrong" or "sinful." *The States have the power to make a morally neutral judgment that public exhibition of obscene material, or commerce in such material,* has a tendency to injure the community as a whole, to endanger the public safety, or to jeopardize, in Mr. Chief Justice Warren's words, the States' "right . . . to maintain a decent society."

(Footnotes omitted. Italics ours.)

Our own Court of Appeals held a sauna parlor, which is less public than a theater, to be a public place. In *State v. Jones*, 9 Wn. App. 1, 8, 511 P.2d 74 (1973), that court stated:

> In any event, her conduct *was* open and overt because the Rama Royale Sauna was open to the public. Anyone could enter and ask for any of the massages offered. Merely because the appellant's actions took place behind a closed door in a business establishment open to the public does not make those acts any less public. They were only more difficult to observe.

We adopt this reasoning.

The cases cited in support of the contention that the New Paris Theater was not a public place, are oriented to the peculiar language of the ordinance or statute, or to the proposition that live theatrical performances are protected by the First Amendment, and are more distant from the audience than are performances in the cases of cabarets.

■ The arguments of the defendants that their performances are protected by First Amendment rights need not be considered if it is determined that they were obscene. Obscenity is not protected by the First Amendment. *Roth v. United States, supra,* and reaffirmed in *Miller v. California, supra. See also State v. J-R Distribs., Inc., supra.*

The defendants argue extensively, however, that a theatrical performance is protected by the First Amendment as it is in verbal communication. This may be true in the context of a performance communicating a purpose, philosophy or idea (as long as it is not obscene), but there is no possible analogy of a theatrical performance to the conduct that occurred on the stage of the New Paris Theater that was devoid of any plot, and had no purpose whatsoever than to appeal to a sex-oriented prurient interest of an adult male audience.

■ It is contended that there is no Seattle ordinance defining the crime of aiding and abetting, and hence the case must be dismissed against the defendants on that ground. This contention cannot apply to the defendant,

Teresa Natale Marshall, since she was a direct participant and was not charged with aiding and abetting. As to the defendant, James Lee Verdon, the definition of aiding and abetting in the state statutes is sufficient to justify the charge against him. The state statute, RCW 9.01.030, defines aiding and abetting as a status and it must therefore apply to all cities and municipalities where a defendant has actively and knowingly participated in the obscene conduct by his direction and control of the entire performance. Moreover, Seattle Code 12.11.010 states: "The word 'person' wherever used in this chapter . . . means and includes natural persons . . . whether acting by themselves or . . . agent or employee . . ." This ordinance clearly encompasses the defendant Verdon by his management, direction and control, and employment of those directly participating in the obscene conduct.

It is further argued that the ordinance is not sufficiently broad to encompass obscenity. This argument is without merit. The ordinance sets forth acts of prohibited conduct. These acts are specifically enumerated in the ordinance—"state of nudity," "indecent or *lewd* dress," "indecent exposure of his person," "to expose his private parts to public view," *"any lewd act or behavior in any place exposed to public view."* (Italics ours.) These specifics must be considered in context with the purpose of the ordinance, and that "lewd" is a word interchangeable in use with "obscene." *Webster's Third New International Dictionary* (1961) defines "lewd" as ". . . dissolute, lascivious . . . indecent, *obscene*, salacious . . ." (Italics ours.)

The judgment of the trial court is affirmed.

HALE, C.J., and ROSELLINI, HAMILTON, STAFFORD, and BRACHTENBACH, JJ., concur.

FINLEY, J. (dissenting)—For the reasons stated hereinafter, I cannot in good conscience agree with the majority opinion.

I would be the first to concede that the performance

engaged in by appellant Marshall would, in all probability, offend the sensitivities of a majority of Seattle's citizenry. However, it is not a proper exercise of this court's authority to stretch the meaning and intendment of an inapplicable ordinance to reach behavior which citizens, or for that matter members of the court, privately or personally may feel should be proscribed. It may well be that the indicated reprehensible societal behavior should be circumscribed, but that is the role of the legislative branch of local or state government.

At the outset, to place this case in proper perspective, it should be established what this case is and what it is not. First, the case involves a charge of indecent exposure brought under a Seattle city ordinance. Second, the defendants are *not* charged with the violation of an obscenity ordinance, *cf. Seattle v. Hinkley*, 83 Wn.2d 205, 517 P.2d 592 (1973), nor are they alleged to have violated the applicable state obscenity statute, RCW 9.68.010. The majority opinion notwithstanding, the only problem involved in this case is the interpretation of the indecent exposure ordinance as it applies to appellants, and no amount of emotionalism can change the facts and the relevant legal issues.

The Seattle city ordinance which appellants are alleged to have violated provides as follows:

> 12.11.220 Indecent exposure. It is unlawful for any person to appear in a state of nudity, or in any indecent or lewd dress, or make any indecent exposure of his person, or to expose his private parts to public view, or be guilty of any lewd act or behavior in any place exposed to public view. (Ord. 16046 § 21; May 23, 1907).

The ordinance renders criminal the exposure of "private parts to public view." To determine the applicability of this ordinance, it must first be determined what constitutes "public view." An identical question of interpretation was presented to the Supreme Court of California in *Barrows v. Municipal Court*, 1 Cal. 3d 821, 464 P.2d 483, 83 Cal. Rptr. 819 (1970). In that case, several members of the cast of a play which involved the graphic simulation of oral inter-

course were charged with violation of a statute which prohibited "lewd or dissolute conduct in any public place or in any place open to the public or exposed to public view." *Barrows v. Municipal Court, supra* at 823 n.1. The California court held that the statute before it had no application to theatrical performances, *i.e.,* performances in a commercial theater. *Cf. Crownover v. Musick,* 9 Cal. 3d 405, 509 P.2d 497, 107 Cal. Rptr. 681 (1973). Likewise, a New York court concluded that a statute forbidding "indecent exposure" did not apply to performances in a theater. *People v. Conrad,* 70 Misc. 2d 408, 334 N.Y.S.2d 180 (Buffalo City Ct. 1972). In a similar decision, the Michigan Court of Appeals held a Detroit "indecent exposure" ordinance inapplicable to "topless go-go dancing." *Jads, Inc. v. Detroit,* 41 Mich. App. 693, 200 N.W.2d 715 (1972).

Does the term "public view" appertain to the exposure of private parts behind the closed doors of the New Paris Theater? I think not. The Seattle ordinance, enacted in 1907, apparently was drafted to protect the public from being affronted in the public parks, on public thoroughfares, and in other unquestionably public places by those who exposed themselves to public view. Thus, the conduct engaged in by appellant Marshall would clearly have been proscribed by the ordinance had it occurred upon the public streets, or if it could have been viewed from a public thoroughfare. The consenting adults who had willingly paid for the privilege of watching the performance here involved are not the class of unsuspecting citizens the ordinance was designed to protect.

The majority attempts to finesse the ordinance's explicit requirement of a "public view" of any exposure of private parts or lewd act by stating that the theater was a public place.[1] Of course, it is! But, that, in itself, does not render

---

[1]The majority bulwarks its "public place" assertion with the case of *State v. Jones,* 9 Wn. App. 1, 511 P.2d 74 (1973), which involved the application of the state vagrancy statute, RCW 9.87.010(7) to activities within the confines of a massage parlor. In that case, there was *no*

the subject performance exposed to public view—it still may not be viewed from the public domain.[2]

If we are to take the majority at its word, it would be entirely proper for a citizen of Seattle or the police to file a valid complaint against any theatrical performance which offended their personal sense of morality.[3]

In conclusion, this court unanimously recently reiterated the cardinal principal of statutory construction that criminal sanctions must be narrowly construed in a manner most favorable to the defendant, *State v. Bell*, 83 Wn.2d 383, 518 P.2d 696 (1974). It is apparent, therefore, that the activities engaged in by appellants did not violate Seattle Code

*requirement* that the offending conduct take place in a public place, and the Court of Appeals refused to impose one. I agree with its characterization in dictum that a massage parlor is a public place, but I cannot understand what the *Jones* case has to do with an ordinance which requires "public view" of the offending behavior.

[2]To stretch the majority's rationale one more step, it could be hypothesized that since members of the public pay to enter the theater, the presence of these admittees would render the performances subject to the requisite "public view." However, this stretches logic too far. Upon paying admission to the New Paris Theater, the admittee becomes, in the eyes of the law, an invitee and is, *ex hypothesi*, no longer a member of the general public.

[3]Theatrical performances which may fall in the minds of some within this class include: *Ballets*: the renowned performance of Ted Shawn in "Adonis" (performed in 1932); the Royal Danish Ballet in "The Triumph of Death"; and renditions of Nikolais' "The Relay" (performed for viewing on the BBC and New York's WNET/13), Harkarvy's "Squares", Smuin's "The Eternal Idol", Lichine's "Cain and Abel", the Netherlands Dance Theater in "Mutations", and the "Bach Suite". *Operas*: the performances of sopranos Arlene Saunders in Ginastera's "Beatrix Cenci" (performed at Kennedy Center) and Grace Bumbry in "Salome"; and production of Prokofiev's "The Fiery Angel". *Plays*: Zero Mostel's performance in "Ulysses in Nighttown" and that of Sarah Stephenson as Desdemona in "Othello"; the Broadway play of "Grin and Bear It"; and the off-Broadway plays of "Hair", "Oh Calcutta", and "Dark of the Moon".

12.11.220.[4] I am convinced that the judgment of the superior court should be reversed.

WRIGHT and UTTER, JJ., concur with FINLEY, J.

Petition for rehearing denied June 24, 1974.

---

[4] I note that in the intervening period following the convictions in the case at bar, the Superior Court for King County has rendered a declaratory judgment holding that Seattle Code 12.11.220 is inapplicable to similar performances at the New Paris Theater. Taylor v. Seattle, King County Cause No. 761928 (Super. Ct. Mar. 21, 1973), *related appeal pending,* Court of Appeals, Division One, Cause No. 2604-I.